**UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellant,**

v.

**Raymond CROFT and Arsilia Croft, Appellees.**

**No. 05–04–00045–CV.**

Court of Appeals of Texas, Dallas.

Aug. 26, 2005.

John K. Vaughan, Stacey D. Walvoord, Grand Prairie, Levon G. Hovnatanian, Bruce E. Ramage, Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, for Appellant.

Michael A. Carter and Robert N. Grisham, II, Dallas, for Appellees.

Before Justices MORRIS, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

United Services Automobile Association (USAA) appeals the judgment awarding Raymond and Arsilia Croft $641,076.15 in actual damages, additional damages, statutory damages, attorney's fees and prejudgment interest for breach of contract, breach of the duty of good faith and fair dealing, and violations of the DTPA and of the insurance code. We modify the judgment and affirm in part as modified, re-

verse and render in part, and remand in part for further proceedings.

## THE PARTIES' CLAIMS

This case involves a dispute between the insured homeowners, Raymond and Arsilia Croft, and the insurer, USAA, about whether USAA should have agreed to pay for repairs to their home's foundation and for cosmetic repairs resulting from damage to the foundation. The Crofts contend that the foundation was structurally damaged by a plumbing leak requiring repair by piering the foundation and by repairing cosmetic damage to their home. They argue that USAA hired a biased engineer to investigate the foundation problems and that it failed to reasonably investigate the claims, breached the insurance contract, committed fraud, breached the duty of good faith and fair dealing, violated the insurance code [1] and the Texas Deceptive Trade Practices Act [2] and that the judgment should be affirmed.

USAA contends it promptly responded to the Crofts' claims by hiring plumbers to locate and fix the leak and by hiring an engineer to evaluate the condition of the foundation and the causes of any problems and to recommend possible repairs. USAA argues it paid for cosmetic repairs needed because of damages from the leak, its engineer was not biased, he conducted a reasonable investigation, he was correct that piering was not necessary and USAA did not commit any wrongful acts. USAA contends the testimony of the Crofts' three experts provided no evidence to support the recovery because their testimony was conclusory and not probative and that the judgment should be reversed.

## BACKGROUND

In July 1998, the Crofts notified their insurer, USAA, about a water leak in their home. Plumbers hired by USAA located and repaired a leak in the water supply line. At the same time, USAA's adjuster Nancy Elble hired Ron Wanhanen, a civil engineer with Starnes Consulting, to investigate the damage caused by the plumbing leak.

Wanhanen produced a report in which he concluded approximately 90,000 gallons of water leaked under the foundation, causing portions of the foundation to heave. The foundation in the area of the leak was about four inches high, creating a domed shape in the foundation. Wanhanen believed the foundation's domed shape was caused by several factors: perimeter soil drying, drainage problems, tree roots removing the moisture from the perimeter of the home, and the plumbing leak. He also concluded the foundation's strength and stability had not been affected by the leak and that, in time, the heave would subside.

Wanhanen recommended remedial measures, such as maintaining a constant moisture level around the perimeter of the house, removing trees or establishing root barriers, and waiting one year for the heave to subside. He also suggested the Crofts have the home inspected every six months to determine how much the heave had subsided. Elble gave the Crofts a copy of the report.

---

1. Act of June 7, 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868; *amended by* Act of April 25, 1957, 55th Leg., R.S., ch. 198, § 4, 1957 Tex. Gen. Laws 401 (subsequent amendments omitted), *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (current version at TEX. INS.CODE ANN. § 541.060 (Vernon Pamph.2004–05)).

2. *See* TEX. BUS. & COM.CODE ANN. § 17.50 (Vernon 2002).

The Crofts disagreed that the plumbing leak only contributed to the foundation's heave and that no repairs were needed to fix it. The Crofts wanted USAA to pay for piering their foundation, and Mr. Croft expressed that desire in writing: "[Wanhanen's recommendations] might stabilize the foundation, but I do not believe that the foundation would return to a level position. Anything short of a level and stable foundation is unacceptable."

At USAA's request, Wanhanen responded to the Crofts' concerns, addressing each in detail and ultimately concluding that installing piers before the heave had subsided could result in a bowl-shaped foundation that would cause more problems than its current domed shape. He expected there would be only a one and one-half inch differential in the area of the leak after the heave subsided. Based on this report, Elble asked the Crofts to give the heave time to subside and told them she would have the foundation reinspected at six-month intervals.

In August 1999, Elble notified the Crofts that Wanhanen's conclusions, after three subsequent inspections, had not changed and USAA would not pay for foundation piering. In his last report, Wanhanen advised that the Crofts could repair the interior damage without concern over continued settlement. USAA had already estimated and paid $10,000 in cosmetic repairs. However, the Crofts paid approximately $30,000 for repairs and wanted USAA to pay that amount. The next month, the Crofts hired Lawrence Peeler, a structural engineer, who prepared a report stating the heave caused stresses to the foundation that may have affected the foundation's strength. He recommended repairs but was not specific in his recommendation.

The Crofts gave Peeler's report to USAA who in turn gave it to Wanhanen. He responded to the report but did not change his conclusion that piering was not necessary to stabilize the foundation.

■ This lawsuit was filed when USAA again refused to pay for foundation piering and all of the cosmetic repairs the Crofts said resulted from the damage to the foundation. All issues were tried to a jury, which returned a verdict in favor of the Crofts. The jury found actual damages from the plumbing leak of $162,000 for foundation repairs and $60,000 for past and future cosmetic repairs. The jury also awarded $50,000 in additional damages to the Crofts for a knowing violation of the DTPA and of the insurance code. The jury did not find USAA acted with malice and did not award exemplary damages. The trial court rendered judgment on the jury verdict and assessed $197,593.35 in statutory damages under article 21.55 [3] of the insurance code; $119,157.80 in prejudgment interest; and $52,325 in attorney's fees plus $30,000 for attorney's fees on appeal.[4]

---

**3.** Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03(a), 1991 Tex. Gen. Laws 939, 1045 (subsequent amendments omitted), *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (current version at Tex. Ins. Code Ann. § 542.060 (Vernon Pamph.2004–05)).

**4.** The final judgment was signed October 14, 2003. USAA timely filed a motion for new trial on November 13, 2003, which was overruled by operation of law on December 28, 2003. *See* Tex.R. Civ. P. 329b(c). USAA timely filed its notice of appeal on January 12, 2004. On January 29, 2004, two days after the trial court's plenary power had expired, the trial court signed a Revised Judgment. *See* Tex.R. Civ. P. 329b(e). The revised judgment is void because it was signed after the trial court lost its plenary power. USAA appeals from the original final judgment.

LEGAL AND FACTUAL SUFFICIENCY ISSUES

In its first issue, USAA argues the evidence is legally and factually insufficient to support the jury's verdict that USAA breached the policy of insurance or that $162,000 in foundation repairs and $60,000 in cosmetic repairs were necessary. Within this issue, USAA also argues the evidence is legally insufficient to support the jury's findings that USAA breached the duty of good faith and fair dealing and violated the DTPA and insurance code.

**Standard of Review**

When an appellant challenges the legal sufficiency of the evidence on an issue on which he did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983); *Dallas County v. Holmes*, 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.). In reviewing a no evidence challenge, we consider the evidence in the light favorable to the verdict and "credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *Holmes*, 62 S.W.3d at 329.

When an appellant challenges the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate there is insufficient evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58; *Holmes*, 62 S.W.3d at

329. In addressing a factual sufficiency challenge, we consider and weigh all of the evidence and set aside the verdict only if the evidence is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986) (op. on reh'g). This Court is not a fact finder and may not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Holmes*, 62 S.W.3d at 329; *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744 (Tex.1986) (findings of fact are the exclusive province of the jury or trial court). When the evidence is conflicting, the jury's verdict on such matters is generally regarded as conclusive. *See Pool*, 715 S.W.2d at 634; *Holmes*, 62 S.W.3d at 329. Accordingly, if there is sufficient competent evidence of probative force to support the finding, it must be sustained. *See Pool*, 715 S.W.2d at 634; *Holmes*, 62 S.W.3d at 329.

**Experts' Opinions**

USAA contends the testimony of the Crofts' experts is conclusory, constitutes no evidence or factually insufficient evidence, and will not support the jury's finding that USAA breached the contract or the resulting damages award.[5] Because resolution of this issue impacts our analysis of the remainder of USAA's first point of error, we address it first.

An expert opinion is conclusory when it offers an opinion with no factual substantiation. *See generally Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227 (Tex.2004); *Burrow*

---

5. USAA did not object either to the Crofts' experts' qualifications or to the reliability of

their testimony. *See* TEX.R. EVID. 702.

*v. Arce,* 997 S.W.2d 229, 236 (Tex.1999). A conclusory opinion is not competent evidence and will not support a verdict. *Coastal Transp. Co.,* 136 S.W.3d at 232. An expert opinion "must have a reasoned basis which the expert, because of his 'knowledge, skill, experience, training, or education,' is qualified to state." *Burrow,* 997 S.W.2d at 236. In other words, the expert must explain how he reached his conclusion. *See id.* When a party challenges the conclusory nature of an expert opinion, we look to the expert's testimony on the face of the record; we do not need to go beyond the record to test the opinion's reliability. *Coastal Transp. Co.,* 136 S.W.3d at 233. And we look to the entire record, not to statements in isolation. *See Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 910 (Tex.2004). An expert may rely on data collected by the insurance company's expert without doing his own testing. *See United Servs. Auto. Ass'n v. Gordon,* 103 S.W.3d 436, 439 (Tex. App.-San Antonio 2002, no pet.). And "[o]bservations of enough [foundations] in various circumstances to show a pattern [is] enough to support [an expert's] opinion." *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998).

### 1. Peeler

In September 1999, the Crofts hired Lawrence Peeler, a structural engineer, to inspect their home and determine whether the foundation's stability had been affected by the plumbing leak. Peeler testified he has been a licensed engineer, with a concentration in structural engineering, for seventeen years. His experience includes design of a variety of structures, including residential and commercial foundations, and forensic investigations, having worked with insurance companies, warranty companies, architects, contractors, and homeowners.

Peeler testified he inspected the interior and exterior of the Crofts' home looking for damages that could be associated with the leak. He also reviewed USAA's engineer's reports and test results and the April 1998 appraisal conducted for purposes of placing the home for sale. He did not conduct any independent tests and relied on USAA's expert's data.

Peeler agreed the foundation heaved because of the leak. He did not investigate whether the other factors Wanhanen cited contributed to the foundation's domed shape because his job was to determine whether the plumbing leak was a factor in causing the heave, and he agreed with Wanhanen that it was. According to Peeler, the soil tests Wanhanen performed indicated the soil was twelve or thirteen percentage points above the plastic limit in the area of the leak, which Peeler concluded was a very wet soil. Based on this test and his personal inspection, Peeler testified the central portion of the home, at least half of the foundation, had heaved from the plumbing leak. He disagreed with Wanhanen that the heave would subside completely, and testified he has never seen a heave return to a level condition. Peeler supported this conclusion with the published treatise written by Robert Wade Brown, which Peeler considered authoritative and accepted in the engineering community. He testified that the treatise stated:

Once a slab heaves, the reinforcing steel is stretched into what amounts to a permanent elongation. Even if the expanded soil were to shrink, the domed slab would tend to remain in the deformed contour. As a matter of interest, a four inch heave over a twelve foot distance would cause the rebars to be stretched about one fourth inch. Even after the cause of the heave is alleviated the domed area is not likely to return to a

level or near level condition. In fact, experience dictates that the distressed area will not improve materially unless appropriate remedial actions are initiated.

Based on his training and experience and Brown's published work, Peeler testified the plumbing leak had induced stresses into the Crofts' foundation that should be alleviated by piering. According to Peeler, the stresses caused by the heave resulted in a significant reduction in foundation stiffness and may have affected its strength. Peeler explained two ways to repair the Crofts' foundation to insure strength and stability: lift the lower portions of the foundation to match the heaved area or lower the heaved area until it is level with the rest of the foundation. According to Peeler, either remedy required piering the entire foundation and partial piering would only result in more problems. He concluded that one hundred percent of the foundation repairs that he recommended were needed because of the plumbing leak.

Peeler also testified about the other factors Wanhanen considered, such as tree roots, drought, and drainage problems. Wanhanen testified that tree roots growing under the foundation caused shrinkage by removing moisture from the soil and contributed to the heave. But the boring samples Wanhanen took from the Crofts' home contained no evidence of tree roots under the foundation. Peeler testified that he did not ignore the possibility that vegetation could be a factor, but that based on the reports and soil information he did not see a cause-and-effect relationship between vegetation and the heave and believed that the possible other factors were only "suspicions of those other conditions" because Wanhanen did not provide substantiation for those conditions.

Additionally, Peeler stated in his report that because the points Wanhanen measured within the zone of influence are well within the perimeter of the home, they most likely would not be significantly influenced by drying of soil around the perimeter due to drought and tree roots. Peeler also testified that he observed the drainage problem on the northwest corner referenced in Wanhanen's report but concluded it did not have an effect on the heave, which was in the middle of the house.

USAA cites several cases to support its argument that Peeler's testimony is conclusory. In one case, *Anderson v. Snider*, 808 S.W.2d 54 (Tex.1991), the supreme court held that an attorney's affidavit that stated only legal conclusions that "I acted properly . . . and have not violated the [DTPA] . . . [and] did not breach my contract . . . ." did not provide an underlying basis or reasoning to support the conclusions, that the affidavit was incompetent evidence and would not support his summary judgment. *Id.* at 55. But Peeler's testimony is not like the attorney's affidavit in *Anderson* because Peeler testified about the factual basis supporting his opinion and explained how he reached his conclusion.

The other cases cited by USAA are also distinguishable from the facts in this case. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir.1997) (court rejected expert's testimony because it failed to meet reliability test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995) (expert testimony properly excluded because did not meet standards of scientific reliability under rule 702 of rules of evidence); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497 (Tex.1995) (expert's opinion constituted no evidence of causation because opin-

ion based on assumed facts that varied materially from actual, undisputed facts); *Gross v. Burt,* 149 S.W.3d 213 (Tex.App.-Fort Worth 2004, pet. filed) (testimony not reliable because expert had no personal knowledge, experience or any scientific data to support theory); *Gammill,* 972 S.W.2d at 726–27 (expert not qualified to render opinion); *Ramirez,* 159 S.W.3d at 911 (expert testimony conclusory and constituted no evidence because expert cited no testimony, tests, or physical evidence to support opinion).

In contrast, Peeler's opinion was based on his knowledge, training, and experience as a structural engineer, his personal inspection of the Crofts' home, and on the data and physical evidence compiled by Wanhanen. And the evidence showed his opinion was supported in a published treatise relied on in the engineering community. *See Burrow,* 997 S.W.2d at 236 (opinion with reasoned basis not conclusory).

We conclude that Peeler's testimony is not conclusory. *See Burrow,* 997 S.W.2d at 236.

### 2. Childers

■■ Richard Childers, president of Abacus Foundation Repair, testified for the Crofts concerning the cost to repair their foundation. USAA contends Childers' testimony is conclusory and will not support actual damages of $162,000 for those repairs.

Childers testified he has been in the foundation repair business since 1998 and has repaired thousands of homes and inspected over 3,000 homes. He was hired by the Crofts' attorney to inspect the Crofts' home and provide a report.[6] Childers explained that he prepared an independent evaluation of the structure of the Crofts' home using his standard pro-

cess for determining whether a foundation needs repairs: he measures the structure, looks for anything unusual that might obstruct the repairs, takes elevation readings in each room of the house, and develops a topography of the foundation. Based on this evaluation of the Crofts' home, Childers determined that foundation repairs were needed. Childers testified he has never seen a heaved foundation return to level, and the amount of water lost to the soil beneath the foundation made it unpredictable. The only way to be sure the foundation is fixed, according to Childers, is to pier all of it.

Childers testified that his estimate included boring tunnels under the foundation to install pilings under the foundation's interior. He explained that this method of piering was required here because if he drilled through the foundation, the holes would weaken it. He also testified that once a foundation is damaged by a heave, it can never be repaired one hundred percent, but the idea is to support the whole structure even with the breaks. If the foundation were left unrepaired, Childers testified it could continue to break and fall off.

Childers based his opinion on his independent evaluation of the Crofts' home using his knowledge, training, and experience in the foundation repair industry, and his testimony is not a "naked and unsupported opinion or conclusion of a witness." *See Coastal Transp. Co.,* 136 S.W.3d at 232 (quoting *Dallas Ry. & Terminal Co. v. Gossett,* 156 Tex. 252, 294 S.W.2d 377, 380 (1956)); *Burrow,* 997 S.W.2d at 235. We conclude Childers' testimony is not conclusory.

### 3. Dato

■■ Vance Dato testified for the Crofts concerning the cost of cosmetic re-

---

6. Childers' report is not part of the record.

pairs to their home. USAA also contends Dato's testimony is conclusory and will not support the award of $60,000 in actual damages for cosmetic repairs.

Dato testified he has been in the remodeling business for twenty-three years. He testified the Crofts hired him in 2001 to make repairs to their home, which included sixty-seven drywall cracks, plumbing, painting, and straightening doors, for a total of $34,000. According to Dato, all but $4,000 of these repairs were related to foundation movement. He testified $30,000 was a fair and reasonable cost in Dallas County for these repairs. His contract and an itemized list of repairs were admitted into evidence.

Dato also testified that "quite often" he is asked to make repairs to a home after its foundation has been leveled. In his experience, repairs made before the foundation is leveled will have to be repaired again after the foundation is leveled. He estimated the Crofts could expect to pay as much or more in repairs than the first time, or another $30,000, because when a house is leveled, "basically everything comes back loose that has either been fixed or that you are going to have even more drywall movement in the house."

Dato explained that a sideways crack in drywall cannot be taped over because if the house moves again, the crack will pop open. Instead, it needs to be re-drywalled. Dato also testified he has worked on houses that had to be leveled first and that the "rule of thumb" is basically every former repair "comes back loose." He testified that there will be additional cracks from the movement, problems with doors, and the entire house would have to be repainted after the repairs were made.

Dato's testimony provided an explanation and factual support for his conclusion, and we conclude Dato's testimony is not conclusory. *See Burrow,* 997 S.W.2d at 236.

### Breach of Contract

■ We now address whether the evidence is legally and factually sufficient to support the jury's finding that USAA breached its contract with the Crofts when it denied their claim for foundation and cosmetic repairs.

#### 1. Legal Sufficiency

USAA concedes that its insurance policy covers foundation damage caused by a plumbing leak. But it disputes whether the foundation actually was damaged by the leak. Peeler testified the heave caused stress to the foundation and that the only way to repair it was to pier it. Wanhanen's report also concluded that the plumbing leak contributed to the heave, but he recommended waiting one year for the heave to subside and for "corrective actions to *stabilize* the foundation" (emphasis added). He stated that "[w]hen an acceptable level of foundation *stability* has been achieved, cosmetic repairs can be made to eliminate visible signs of distress" (emphasis added).

Based on this testimony, we conclude there is more than a scintilla of evidence that the plumbing leak caused damage to the foundation and that USAA breached the contract when it failed to pay for repairs.

#### 2. Factual Sufficiency

Peeler and Wanhanen both testified that the plumbing leak caused, or at least contributed to, the foundation's heave. Wanhanen concluded the heave would subside within a year and that the foundation's strength had not been affected. He based this opinion on the concrete boring results, which showed that the concrete's strength in an area away from the leak was in the normal range. However, the boring sam-

ple taken from the area of the leak was not tested for strength. Wanhanen also reasoned that installing foundation piers before the heave subsided could result in a bowl-shaped foundation that would present more problems than the current dome-shaped foundation. It would also cause damage to the home's interior that had already been repaired.

Six months after the leak was reported, Wanhanen conducted a follow-up evaluation of the Crofts' foundation and concluded that "[t]he present shape of the slab ... indicate[s] there are remaining residual effects of the water leak and continued subsidence is very likely to occur within the next six months." However, Wanhanen concluded he could see "no sign that the structural stability or safety of the home has been compromised." In his final report a year after the leak was discovered, Wanhanen did not change his recommendation. But he stated "if Mr. Croft desires to return the slab to a more nearly level condition immediately ... that decision could be justified."

Peeler agreed that, from an engineering perspective, it made sense to wait to see if the heave would subside. But he also testified he had never seen a heave return to a level condition. In his opinion, the heave caused stresses to the foundation, which raised concerns about the foundation's strength and stability. Peeler testified the only way to repair the Crofts' foundation was to pier it, and Peeler supported his opinion with a published treatise.

The Crofts' other expert, Childers, agreed that piering was the only way to repair the Crofts' foundation. Dato's testimony was that most of the repairs he had previously made would need to be redone after the piering was completed. In addition to the experts' testimony, other evidence was introduced, including the experts' reports, photographs of the interior and exterior damages to the Crofts' home, and a 1998 appraisal, which stated that no foundation settlement was noted at that time.

To support its position, USAA relied on Wanhanen's testimony and the cross-examination of the Crofts' experts. USAA essentially argues now that the evidence supports its position and that the jury reached the wrong result. But even if the jury could have reached a different result, we cannot conclude the evidence is so contrary to the verdict as to be clearly wrong and unjust. *See Maritime Overseas Corp.,* 971 S.W.2d at 407; *Pool,* 715 S.W.2d at 634.

We conclude the evidence was legally and factually sufficient to support the jury's finding that USAA breached its contract when it failed to pay for repairs to the Crofts' foundation and for cosmetic repairs.

### Awards for Foundation and Cosmetic Repairs

USAA next argues the evidence is legally and factually insufficient to support the damages award for foundation and cosmetic repairs.

#### 1. Foundation Repairs

Childers estimated the cost to pier the Crofts' foundation at $161,617.50, which included 118 pilings at $650 each installed at seven-foot intervals throughout the foundation. He testified this estimate is a reasonable cost in Dallas County for this type of repair. Peeler testified the range for foundation piering is $300 to $1,000 per pier. USAA presented testimony from a foundation repair company president who testified that the range for piers is $250 to $600 each. But he testified that his piers, called Helical piers, are screw anchors and are different from the pressed

pilings which Peeler and Childers discussed. Although USAA's expert estimated a lower cost, the Crofts' experts' estimates were consistent. And the fact that the Crofts' experts' testimony may not be consistent with the testimony of USAA's expert does not make it insufficient. *See Moore v. Bank Midwest, N.A.,* 39 S.W.3d 395, 401 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). We conclude the evidence is legally and factually sufficient to support the $162,000 damages award for foundation repairs.

### 2. Cosmetic Repairs

■ Dato did not state what specific repairs would be required after the foundation is leveled. However, he testified, based on twenty-three years' experience in the remodeling business, that the same or more repairs would be required after lifting the foundation as the repairs the Crofts had already paid for which were caused by foundation movement. His estimate for those future repairs was $30,000, the amount the Crofts paid to repair the cosmetic damages after the plumbing leak was repaired. Dato's testimony supported the reasonableness and necessity of these repairs. *See Allright, Inc. v. Lowe,* 500 S.W.2d 190, 192 (Tex.Civ.App.-Houston [14th Dist.] 1973, no writ); *Nielson v. Okies,* 503 S.W.2d 614, 616 (Tex.Civ.App.-El Paso 1973, no writ). Additionally, Peeler testified it would be speculation to testify about specific damages that will occur when the foundation is lifted, but he agreed, as did Wanhanen, that damages would result if the foundation is lifted.

We conclude the evidence is legally and factually sufficient to support the jury's award of $60,000 in actual damages for past and future cosmetic repairs.

### Breach of the Duty of Good Faith and Fair Dealing

■ Also under issue one, USAA argues the breach of the duty of good faith

and fair dealing is not an alternate basis for the award of actual damages and, even if it is, there is no evidence to support the jury's finding that it breached that duty. We agree the evidence is legally insufficient to support a finding that USAA breached the duty of good faith and fair dealing and sustain this subpart of USAA's first issue.

■ The common-law duty of good faith and fair dealing is breached when an insurer denies or delays payment of a claim after its liability has become reasonably clear. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 56 (Tex.1997). Within this duty is an insurer's obligation to conduct an adequate investigation of the claim. *See State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 449 (Tex.1997). Evidence of a bona fide coverage dispute will not, standing alone, support a finding of bad faith. *Id.* at 448. Additionally, an insurer's reliance on an expert's report will not support a finding of bad faith unless it is shown "the report was not objectively prepared or the insurer's reliance on the report was unreasonable." *Id.*

In this case, when USAA was notified of the plumbing leak, it immediately sent an adjuster and plumbers to the Crofts' home. USAA worked with the homeowners to isolate and repair the plumbing leak and hired an engineer to assess the damages caused by the leak.

The Crofts argue that USAA hired Starnes Consulting to prepare a "pretextual report" to justify its denial of the Crofts' claim for foundation repairs. However, the evidence showed that USAA's engineer monitored the repair of the plumbing leak and the pressure tests, took 139 elevation point measurements which he used to map the foundation's surface, made a detailed list of interior and exterior signs of dis-

tress, determined the type and construction of the foundation, took soil and concrete samples for use by a geotechnical specialist to determine the thickness and compressive breaking strength of the foundation, determined the grading on the lot, and estimated the water consumption records to assist in determining the amount of water lost to the soil beneath the foundation.

Additionally, the evidence showed Wanhanen considered the home's history in his report. He learned the Crofts had seen evidence of foundation settlement in the past and repaired minor cracks in drywall every five or six years. Wanhanen was told the builder installed piers or footings under the perimeter grade beam on the east side of the house for additional support before the Crofts purchased the home. The Crofts also told Wanhanen the house had flooded on a couple of occasions in the past and they installed a french drain and sump pump to alleviate this problem.

Based on his elevation measurements, contour map, inspection of the home, the home's history, and test results, Wanhanen concluded that other factors contributed to the foundation's domed shape and that by taking certain precautions, the heave would subside and stabilize the foundation without the necessity of piering. Wanhanen concluded the foundation movement did not reveal any problem severe enough to impair the future use and enjoyment of the house or significantly affect the structural stability of the home.

At USAA's request, Wanhanen reinspected the Crofts' home at six-month intervals, for a total of four inspections. Each time, he remeasured all 139 elevation points. Wanhanen ultimately concluded the heave had subsided within the first six months. He also concluded the strength and structure of the foundation had not been compromised by the leak.

At trial, Wanhanen testified the Crofts' home may have been the first inspection he conducted as a licensed engineer. He testified that, since that time, he has never recommended piering to repair foundations that have heaved due to a plumbing leak. Additionally, Wanhanen testified he was unsure of Starnes' record of recommending piering, although he could recall one case where Starnes had made such a recommendation while he was employed there. Wanhanen also testified that he and Starnes made independent reports and were not hired to give a report with a predetermined conclusion.

The Crofts contend the evidence shows that Wanhanen was biased because he did most of his work for insurance companies and had never concluded that a foundation needed to be piered due to a plumbing leak causing a heave in a foundation. But in addition to performing insurance investigations while employed by Starnes, Wanhanen testified he did residential land development, which included designing sewer and water systems, drainage and lot layout. Since he left Starnes in 1999, he has also worked for homeowners, real estate agents, and prospective buyers performing forensic foundation evaluations.

The Crofts also contend that Wanhanen's opinions were baseless and his investigation was incomplete because they believe Wanhanen gave unsupported and contradictory opinions about how much the foundation heaved from the plumbing leak and failed to conduct tests which would determine the validity of his conclusion that other factors contributed to the heave. However, Wanhanen's report did not deny that the plumbing leak contributed to the foundation's heave. And USAA does not dispute that the plumbing leak at least contributed to the heave.

Additionally, Flygstad, USAA's adjuster who replaced Elble, testified he would never hire an engineer to give an opinion with a predetermined outcome and that he always confirmed with the engineers that they would recommend foundation piering if necessary. Flygstad did not know Starnes had recommended foundation piering only once in the past. Elble did not testify and there was no evidence indicating her reason for hiring Starnes Consulting. There is no evidence that they were aware of a bias and hired Wanhanen anyway. *See Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 705 (Tex.App.-Fort Worth 2003, no pet.).

The Crofts also argue that the evidence supported a finding that USAA breached the duty of good faith and fair dealing because Peeler's report a year later made USAA's liability on the claim reasonably clear. We disagree. Both experts agreed the plumbing leak contributed to the foundation's heave, but Wanhanen cited other factors that also contributed to the heave and Peeler did not rule out these factors. Peeler observed cracks, less than one-eighth inch wide, on the east side of the home's foundation, which he stated "appeared structural." But Peeler did not explain why the cracks appeared structural other than they were "in excess of normal shrinkage cracks." Wanhanen's report stated that cracks less than one-eighth inch wide are not considered structural, and the cracks Peeler observed were in the garage—an area away from and not affected by the leak. Additionally, Peeler's report stated the differential in the area around the leak "may have been influenced somewhat by the drying effect of the mature trees in the yard and therefore may not be fully attributable to the water leak."

 An insurer does not act in bad faith where a reasonable investigation re-

veals the claim is questionable. *See St. Paul Lloyd's Ins. v. Fong Chun Huang,* 808 S.W.2d 524, 526 (Tex.App.-Houston [14th Dist.] 1991, writ denied). And insurance carriers maintain the right to deny questionable claims without being subject to liability for the erroneous denial of the claim. *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988). A bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994).

We conclude there is no evidence indicating Wanhanen's report was not objectively prepared or that USAA's reliance on the report was unreasonable. There is no more than a scintilla of evidence to support the jury's finding of a breach of the duty of good faith and fair dealing. We sustain this subpart of USAA's first issue.

### DTPA and Insurance Code Violations

Next under issue one, USAA argues there is no evidence to support the jury's findings it violated the DTPA and the insurance code. Because USAA challenges only the legal sufficiency of the evidence, we review the evidence only to see if there is more than a scintilla of evidence to support the jury's findings. *See Holmes,* 62 S.W.3d at 329.

The jury answered "yes" when it was asked whether USAA engaged in any unfair or deceptive act or practice that caused damages to the Crofts. The charge defined "unfair or deceptive act or practice" as:

a) Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear; or

(b) Refusing to pay a claim without conducting a reasonable investigation of the claim; or

c) Misrepresenting to a claimant a material fact or policy provision relating to coverage at issue; or

d) Failing within a reasonable time to affirm or deny coverage of a claim to a policyholder; or

e) Misrepresenting the insurance policy by making an untrue statement of material fact; or

f) Misrepresenting the insurance policy by failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made; or

g) Misrepresenting the insurance policy by making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact.

The jury also answered "yes" when asked whether USAA engaged in an unconscionable action or course of action, which the jury charge defined as "an act or practice that, to a person's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree."

Additionally, the jury found USAA engaged in an unfair act or practice and in unconscionable conduct "knowingly," that is, with "actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question."

### 1. Unfair or Deceptive Act or Practice under the DTPA

USAA argues there is no evidence to support the jury's finding under any of the listed acts or practices. We previously considered (a) and (b) under the discussion about the duty of good faith and fair dealing and concluded there was no evidence that Wanhanen's report was not objectively prepared or that USAA's reliance on the report was unreasonable. We have reviewed the record and briefs and find no other argument or basis upon which the jury could have reached its decision on this issue. Accordingly, we conclude there is no evidence to support the jury's finding that USAA engaged in a deceptive act or practice.

### 2. Unconscionable Conduct under the Insurance Code

Unconscionability is not automatic every time an insurer breaches its policy. *Nicolau*, 951 S.W.2d at 451. To prove unconscionable conduct, the Crofts had to prove that USAA took advantage of their lack of knowledge, ability, experience or capacity to a grossly unfair degree. TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 2002). The Crofts must also show the "resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex.2001).

The Crofts argue USAA's unconscionability is established because it hired Starnes and Wanhanen as engineers knowing they would never recommend foundation piering. Essentially the Crofts contend that USAA conducted a "sham investigation" and was determined to deny their claim. *See Mason*, 123 S.W.3d at 706. They argue USAA's unconscionability is also demonstrated because it rejected Peeler's report stating that foundation piering was necessary; argued Peeler never recommended piering when he did; and refused to suggest any other means for resolving the dispute, such as hiring a third engineer.

The evidence showed that USAA forwarded Peeler's report to Wanhanen for review and that Flygstad told Wanhanen if he "had a change of heart" concerning

foundation damage after reviewing Peeler's report, to put that in his response. Wanhanen responded to Peeler's report with a detailed explanation why he disagreed with Peeler's conclusions.

Flygstad also testified that Peeler did not recommend foundation piering in his report. Conversely, the Crofts interpret Peeler's report as recommending piering, just no specific design for piering, and that Flygstad's statement that it did not shows unconscionability. We disagree. Peeler's report states, "it is my opinion that structural repairs are required" but does not recommend any method of repair. Flygstad testified he did not hire a third engineer in this case because Peeler's report did not recommend piering. He testified from his experience that the homeowner's expert usually makes a recommendation, and he was surprised Peeler made no recommendation in his report. Because of this, he did not see the need to hire a third engineer.

Additionally, Flygstad was asked whether he ever scheduled meetings of the homeowner and engineers when there was a dispute over a claim. Flygstad testified he had done that before and that he "recommended it in this case." But no follow-up questions were asked to determine why such a meeting was not held with the Crofts, Peeler, Wanhanen and USAA.

The evidence also showed that before the Crofts ever reported their claim to USAA, they discussed the foundation issue with their neighbor, Hani Ghorayeb, an engineer who eventually became Peeler's partner. Ghorayeb told the Crofts that installing piers would be required to make the foundation level. He also told the Crofts it would be impossible for the insurance company to know whether the leak caused the foundation problems or the foundation problems caused the leak.

After receiving Wanhanen's initial report, Mr. Croft wrote USAA disputing Wanhanen's conclusions:

The plumbing leak resulted in over 280,000 gallons of hot water over 4 months washing out the soil under the foundation on the east side of the house. With a 9″ differential between the highest and lowest elevations, the stress has caused substantial interior and exterior damage to our home. The foundation is actually cracked on the east side and the structural integrity is suspect, at best.

The evidence shows the Crofts knew about the foundation issue and even discussed it with an engineer before contacting USAA. Mr. Crofts' letter to USAA demonstrated his familiarity with the issues involved. Additionally, USAA paid for over $10,000 in repairs caused by the leak. And we have already held that USAA did not perform an unreasonable investigation and did not violate the duty of good faith and fair dealing. The record does not support the jury's finding that USAA took advantage of the Crofts' lack of knowledge or experience to a grossly unfair degree. *See Nicolau,* 951 S.W.2d at 451.

We sustain this subpart of USAA's first issue.

In summary of USAA's first issue, we affirm the trial court judgment awarding $222,000 in damages for breach of the insurance policy. We reverse that portion of the judgment which awards actual damages for breach of the duty of good faith and fair dealing and violations of the DTPA and of the insurance code and render that the Crofts take nothing on these claims.

### ADDITIONAL DAMAGES

In its third issue, USAA argues the trial court erred in awarding $50,000 in additional damages as assessed by the jury for a knowing violation of the DTPA and of

the insurance code.[7] Because we have found the evidence legally insufficient to support the jury's finding of a violation of the DTPA and of the insurance code, we sustain USAA's third issue challenging a finding of a knowing violation of those same codes. We reverse that portion of the judgment awarding $50,000 in additional damages and render that the Crofts take nothing by way of this claim. Because we have modified the judgment and award, we also remand to the trial court for the recalculation of prejudgment interest.

### STATUTORY DAMAGES

In its fourth issue, USAA argues it was error to award the Crofts $197,593.35 as statutory damages under article 21.55 of the insurance code because an insurer must first be found liable on the claim and the evidence is insufficient to support USAA's liability. Article 21.55 provided:

> In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable to pay the holder of the policy, ... in addition to the amount of the claim, 18 percent

per annum of the amount of such claim as damages, together with reasonable attorney fees.

Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03(a), 1991 Tex. Gen. Laws 939, 1045 (repealed) (current version at TEX. INS.CODE ANN. § 542.060 (Vernon Pamph. 2004–05)).

The evidence supports the jury's finding that USAA's denial of the Crofts' claim for foundation repairs was a breach of the insurance policy. The wrongful denial of a claim is a delay in payment for purposes of article 21.55.[8] *United Servs. Auto. Ass'n v. Mainwaring*, No. 05–03–01250–CV, 2005 WL 667683, at *10 (Tex. App.-Dallas, Mar.23, 2005, no pet. h.) (citing *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 461 (5th Cir.1997)); *Cater v. United Servs. Auto. Ass'n*, 27 S.W.3d 81, 83 (Tex.App.-San Antonio 2000, pet. denied). When an insurance company denies a claim, it runs the risk that its decision may be wrong and subject it to liability. *Mainwaring*, 2005 WL 2005 667683, at *10. We overrule USAA's fourth issue.[9]

### ATTORNEY'S FEES

The trial court awarded $52,325 in attorney's fees for trial and $30,000 in

---

7. The jury did not assess actual damages, apart from foundation and cosmetic repairs, for violations of the DTPA or insurance code.

8. Article 21.55 provided:

 (a) [A]n insurer shall notify a claimant in writing of the acceptance or rejection of the claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer, in order to secure final proof of loss.
 * * *
 (d) If the insurer is unable to accept or reject the claim within the period specified by Subsection (a) ... the insurer shall notify the claimant, not later than the date specified under Subsection (a).... The notice provided under this subsection must

give the reasons the insurer needs additional time.
 (e) Not later than the 45th day after the date an insurer notifies a claimant under Subsection (d) of this section, the insurer shall accept or reject the claim.

Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03, 1991 Tex. Gen. Laws 939, 1044 (current version at TEX. INS.CODE ANN. §§ 542.046, .058 (Vernon Pamph.2004–05)).

9. The trial court calculated statutory damages on $222,000, which was the amount of damages for repairs assessed by the jury. It did not include the $50,000 in additional damages that we have reversed. As a result, we do not modify the court's award of statutory damages.

attorney's fees for appeal based on article 21.55 and section 38.001 of the Texas Civil Practice and Remedies Code. In its fifth issue, USAA contends the award of attorney's fees must be reversed because the Crofts did not prevail on any claim authorizing the recovery of attorney's fees. To the contrary, article 21.55 authorizes the award of attorney's fees when an insurer fails to comply with the provisions of the insurance code concerning prompt payment of claims such as those in this case. Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03(a), 1991 Tex. Gen. Laws 939, 1044 (repealed). As we stated about USAA's fourth issue, the wrongful denial of a claim is actionable under article 21.55.

■■■ USAA also argues there is "no mechanism by which [the Crofts] would be entitled to their appellate attorney's fees" but USAA cites no authority for its contention. This issue has not been adequately briefed and, as a result, is not presented for our review. *See* Tex.R.App. P. 38(h).

We overrule USAA's fifth issue.

### Fraud

In its sixth issue, USAA argues the evidence is insufficient to support the jury's finding that USAA committed fraud. Because the jury assessed no damages on this finding, and the trial court did not render judgment based on fraud, we need not reach this issue. *See* Tex.R.App. P. 47.1.

### Conclusion

For these reasons, we (1) affirm that portion of the judgment awarding the Crofts actual damages of $222,000 for breach of contract; (2) affirm that portion of the judgment awarding the Crofts attorney's fees and statutory damages; (3) reverse that portion of the judgment awarding actual damages for breach of the duty of good faith and fair dealing and viola-

tions of the DTPA and of the insurance code and render that the Crofts take nothing by these claims; (4) reverse the award of $50,000 in additional damages for a knowing violation of the DTPA and of the insurance code and render that the Crofts take nothing by this claim; and (5) remand to the trial court for a recalculation of the award of prejudgment interest on actual damages of $222,000 for breach of contract.