A & W PROPERTIES, INC., Appellant

v.

**THE KANSAS CITY SOUTHERN
RAILWAY COMPANY,**
Appellee.

No. 05–04–01669–CV.

Court of Appeals of Texas,
Dallas.

Aug. 28, 2006.

Robert H. Westerburg, McCorkle Westerburg & Thornton, P.C., Dallas, TX, for Appellant.

Paul Oliver Wickes, Hunton & Williams LLP, Dallas, TX, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and MAZZANT.

## OPINION

Opinion by Justice FITZGERALD.

A & W Properties, Inc. appeals a take-nothing summary judgment entered against it and in favor of Kansas City Southern Railway Company (the "Railroad"). In a single issue, A & W challenges the trial court's conclusion that A & W's state-law claims are preempted by the Interstate Commerce Commission Termination Act (the "ICCTA"). We affirm the judgment of the trial court in part and reverse and remand in part.

### BACKGROUND

A & W acquired a parcel of land in Garland, Texas, for purposes of development. A & W's land is adjacent to land owned by the Railroad. The Railroad's property includes a creek, which flows through a culvert. The culvert, in turn, runs under a bridge. Tracks on the bridge carry the Railroad across the creek. In July 2003, one day after A & W acquired its land, it advised the Railroad that a study had revealed that A & W's land lay in a flood plain. The study was performed in May 2003, and was required by the City of Garland for purposes of the development planned by A & W. The study indicated the Railroad's culvert would be too narrow to contain the creek in the event of a 100–year flood. A & W makes no allegation of actual or imminent flooding of its property. Instead, A & W alleges it was unable to obtain a building permit for the planned development because of the possibility of flooding. A & W demanded that the Railroad fix the problem; the Railroad refused.

A & W filed this lawsuit against the Railroad, pleading the following causes of action: breach of statutory duty, by violating article 6328 [1]; nuisance; negligence;

---

1. The relevant statute states:
   In no case shall any railroad company construct a roadbed without first constructing the necessary culverts or sluices as the natural lay of the land requires for the necessary draining thereof.

trespass; and a request for injunctive relief.[2] As an alternative to injunctive relief to prevent any possibility of flooding, the petition sought an award of actual and exemplary damages. In an amended petition, A & W added a second ground to its breach-of-statutory-duty claim, alleging a violation of section 11.086 of the Texas Water Code.[3]

### THE RAILROAD'S SUMMARY JUDGMENT MOTION

The Railroad moved for summary judgment on all of A & W's claims on the single ground that the claims were preempted by federal law. The Railroad's summary judgment evidence includes an affidavit from Kenneth Lee, the Railroad's Director of Field Engineering. Lee's affidavit states, that to remedy the bridge-culvert crossing as A & W requested, the Railroad must:

> (I) spend hundreds of thousands of dollars to make a significant capital improvement to its main line rail facility, (ii) temporarily shut down the stretch of track that passes by the Property to perform the construction work to enlarge the bridge, and (iii) operate trains at a dramatically reduced speed during those periods when the track is not shut down completely but while work is being done in the area.

Lee's affidavit includes a minimum estimate of cost to perform the work of "more than $550,000."

The motion also relied on an affidavit from Mark Dabney, a terminal Superintendent for the Railroad. Dabney's job duties include managing car and train movements over all the Railroad's tracks in Texas. Dabney's affidavit outlines the patterns of the Railroad's traffic through the North Texas area, and it describes the rerouting and switching maneuver that trains would have to undergo to accommodate the crossing construction. The affidavit explains that most Railroad trains are more than 6,000 feet in length, and are occasionally more than 10,000 feet in length. But because of the size of the switching location, the Railroad would only be able to operate trains 4780 feet in length, or less. As Dabney testifies:

> Thus, to reroute the existing traffic and make the switching move . . . [the Railroad] would have to operate shorter trains than it normally does. This, of course, would require [the Railroad] to operate additional trains to move the same amount of freight. Operating the additional trains would add to [the Railroad's] costs in that it would have to use additional locomotives and train crews.

According to Dabney, the delays caused by the rerouting itself, the switching proce-

---

Tex Rev.Civ. Stat. Ann 6328 (Vernon 2002).

2. The petition asked the court:
   to permanently enjoin the Defendant Railroad from restricting the flow of water in Bradfield Creek at Highway 78, Garland, Texas, and order the Defendant Railroad to construct and maintain culverts of a sufficient size so that they will not interfere with the free and unobstructed flow of water from a 100 year flood passing through Bradfield Creek at Highway 78, Garland, Texas.

3. The relevant statute states:

(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.
(b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.
Tex. Water Code Ann. § 11.086 (Vernon 2000).

dures, and the additional trains would be significant and the congestion on the main line track would be "unworkable." He concluded that the track cannot be shut down without having a significant effect on the Railroad's rail transportation.

A & W responded, arguing its state-law claims were not preempted because those claims: (1) do not affect interstate commerce, (2) do not affect railroad operations, and (3) are based on the State's police power. Finally, A & W argued that its inverse condemnation claim—added in its live pleading—had not been addressed by the Railroad's motion and evidence concerning preemption; thus, the Railroad had failed to prove that claim was preempted, and summary judgment was inappropriate.[4] A & W did not challenge any of the Railroad's evidence. A & W's summary judgment evidence included an affidavit from Tom Allred, one of the principles of A & W. Allred's affidavit includes the background facts concerning A & W's learning that the property lay in the flood plain and its subsequent purchase of the property and demand that the Railroad enlarge the culvert to alleviate the problem. It also offers "other possible solutions to the flooding problem at [A & W's] Property that would not require any work to be done to the culvert or [the Railroad's] railroad line." Allred's affidavit suggests that the Railroad: build a retaining wall or berm on A & W's property, bring in sufficient fill dirt to raise the level of A & W's property above the level of the flood plain, or build a detention pond on A & W's property.

The trial court granted the Railroad's motion and entered a final judgment in the suit. A & W appeals.

## SUMMARY JUDGMENT STANDARDS

■ The standards for reviewing a summary judgment are well established. The party moving for summary judgment has the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant and indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Nixon*, 690 S.W.2d at 548–49. A defendant may prevail on summary judgment by pleading and conclusively establishing an affirmative defense. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657 (Tex.App.-Dallas 1992, no writ).

## PREEMPTION BY THE ICCTA

The single ground of the Railroad's motion for summary judgment is the affirmative defense of preemption of A & W's state-law remedies by the Interstate Commerce Commission Termination Act ("ICCTA"). Preemption law is rooted in the Constitution's Supremacy Clause, which states "the Laws of the United States ... shall be the Supreme Law of the Land ... any Thing in the Constitution or the Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. On that basis, federal law will displace state law when:

---

**4.** The inverse condemnation claim was added as an alternative claim in A & W's Fourth Amended Original Petition. A & W filed this amended petition the same day it filed its response to the Railroad's summary judgment motion. The record contains neither an ob-

jection to nor a motion to strike this amended pleading. It is the final version of the petition filed before the summary judgment hearing. Accordingly, we treat it as the live pleading for summary judgment purposes.

(1) Congress has acted to expressly preempt state or local law, (2) the intent of Congress to preempt state or local law may be inferred from the existence of a pervasive regulatory scheme, or (3) state or local law conflicts with federal law or otherwise frustrates the accomplishment of a federal objective.

*Rushing v. Kansas City S. Ry. Co.*, 194 F.Supp.2d 493, 497 (S.D.Miss.2001) (citing *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 n. 1 (5th Cir.1995)).

The ICCTA's specific preemption clause provides the focus of our analysis. *See Friberg v. Kansas City S. Ry.*, 267 F.3d 439, 442 (5th Cir.2001). The ICCTA states that the Surface Transportation Board ("STB") has exclusive jurisdiction over:

(1) transportation by rail carriers, and the remedies provided in this act with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b) (1996). This section of the ICCTA goes on to provide that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* One of our sister courts has remarked on the breadth of the ICCTA's preemption provision generally, stating:

Courts have consistently interpreted this preemption language to be broad in scope. . . . . Indeed, *"[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."*

*Burlington N. & Santa Fe Ry. Co. v. City of Houston*, 171 S.W.3d 240, 247 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (quoting *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n*, 944 F.Supp. 1573, 1581 (N.D.Ga.1996)(emphasis added)). As to the specific facts of this case, the definition section of the ICCTA states "rail carriers" include persons providing "railroad transportation" for compensation, and that "railroad" includes a bridge used by or in connection with a railroad. 49 U.S.C. § 10102(5), (6)(A).[5] Nevertheless, A & W proffers two grounds for excusing its claims from this broad preemptive scope.

### Police Power

■ First, A & W argues its claims represent enforcement of the state's traditional police power and that such enforcement is not preempted by the ICCTA. "The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort and the welfare of the public." *LJD Props., Inc. v. City of Greenville*, 753 S.W.2d 204, 207 (Tex.App.-Dallas 1988, writ denied). A & W argues that flood control is a function of the state's police power, and that its claims are no more than efforts to enforce the state's

---

**5.** A & W focuses on the culvert that runs below the bridge; the Railroad focuses on the bridge running across the culvert. The summary judgment evidence includes a picture of the railroad crossing at issue. It is self-evident that any effort to widen the culvert would necessitate making alterations to the bridge on which the tracks cross the culvert. The culvert and bridge are inextricably connected, and we reject semantic efforts to characterize A & W's claims as involving one structure but not the other.

interest in health and safety in this area of flood control.

Congress made no blanket exception for a state's police power when describing the ICCTA's preemptive scope. And a careful reading of cases on which A & W relies makes clear that courts have not read such a categorical exception into the ICCTA. Instead, where cases have made reference to a state's police power in the course of ICCTA preemption analysis, the premise for the discussion is inevitably that the state retains its traditional police power in terms of public health and safety *except* where the state's actions regulate rail transportation. *See, e.g., Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.*, 163 N.J. 446, 750 A.2d 57, 65 (2000) ("the ICCTA does not preempt 'non-discriminatory' public health and safety regulations that do not foreclose or restrict a railroad's ability to conduct its operations"); *see also Sunflour R.R., Inc. v. Paulson*, 670 N.W.2d 518 (S.D.2003) ("exclusive and preemptive jurisdiction granted to the STB is over attempts to impose economic regulation on rail transportation" but claim for rent not established to be "regulation"); *Wheeling & Lake Erie Ry. Co. v. Pa. Pub. Util. Comm'n*, 778 A.2d 785, 792 (Pa.Commw.Ct.2001) (finding "no conflict between the exclusive jurisdiction of the [STB] to economically regulate the rail carriers under the [ICCTA] and the states' authority to regulate the public safety of the rail-highway crossing, which is also part of the public highway"); *In re Appeal of Vt. Ry.*, 171 Vt. 496, 769 A.2d 648, 655 (2000) (affirming preemption decision on zoning issues that "appears to have drawn the line between conditions that purported to regulate the operation of the railroad, including the transport of goods by the railway, and conditions that merely regulated activity regarding motor vehicles coming and going from the facility and the storage of materials at the facility"); *Okla.*

*Corp. Comm'n v. Burlington N. & Santa Fe Ry. Co.*, 24 P.3d 368, 371 (Okla.Civ.App. 2000) (ICCTA not intended "to pre-empt a state agency's police power to require an operating railroad to maintain a fence along its right of way, in the absence of evidence that such a requirement has a significant economic impact on the railroad's operation"). None of these cases challenges the fundamental principle that a state's police power must yield if federal law occupies the same field or if the state law frustrates the intent of the federal law. This is the inevitable result of the Constitution's supremacy clause, the source of all preemption law. *See CSX Transp., Inc. v. City of Plymouth*, 92 F.Supp.2d 643, 647 (E.D.Mich.2000) (as result of Supremacy Clause, "where a state law conflicts with or frustrates a federal law, the former must yield"). If federal preemption is merely implied, courts may struggle to determine whether certain police-power concerns are within the scope of the field intended to be occupied by federal law. *See generally Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 745 (Tex.2001). However, in the case of the ICCTA, preemption is express: where state law purports to regulate rail transportation and to afford remedies against railroads on that basis, claims for relief based on the state law fall within the exclusive jurisdiction of the STB. *See* 49 U.S.C. § 10501(b); *see also Friberg*, 267 F.3d at 443–44 (addressing the "all-encompassing language" of section 10501(b)).

█ A & W argues that its claims are rooted in the traditional Texas police power of flood control and that its claims identify public safety concerns that are not preempted by ICCTA. In support of its argument, A & W relies on two cases in which state law required railroads to make necessary repairs to dangerous rail-highway crossings. *See Iowa, Chicago &*

*E.R.R. Corp. v. Washington County, Iowa,* 384 F.3d 557, 561 (8th Cir.2004) (involving four bridges and "substandard highway safety conditions"); *Wheeling & Lake Erie Ry.,* 778 A.2d at 789 (involving bridge in "seriously deteriorated condition").[6] These cases are distinguishable from the case at bar. The Eighth Circuit explains at length the history of regulatory federal-state cooperation in the realm of highway safety, and concludes that preemption in its case would depend upon an implied repeal, at a minimum, of the non-preemption provision of the Federal Aid to Highways Act and its implementing regulations. *Iowa, Chicago & E.R.R.,* 384 F.3d at 559–61. Although *Wheeling & Lake Erie Ry.* does not provide the same detailed understanding of the partnered regulation of rail-highway crossings, it cites a list of United States Supreme Court cases which, it argues, establish that the regulation of rail-highway crossings has been specifically reserved to the states. 778 A.2d at 791–92. We find no such history in federal law (whether in statute or case law) relating to potential flooding.

These two cases are factually distinguishable as well. In A & W's case, there is no summary judgment evidence indicating the culvert or the bridge crossing it—as they exist today—present any danger to the public, let alone an imminent one. The only way flooding related to the culvert could become dangerous is if A & W tries to develop its property in a prohibited fashion. Indeed, in a very real sense, the police power A & W argues for has already been exercised in this case by the City of Garland. The City's permitting process places constraints on how properties adjacent to the culvert and bridge are to be developed. Denying building permits to A & W represents the City's resolution of the future risk of flooding: it has constrained A & W's ability to develop the property without providing safeguards against flooding. A & W wishes to transfer its obligations to the Railroad, but the ICCTA's preemptive scope forbids attempts to make that transfer through state tort law.

We conclude that A & W's state-law claims cannot escape federal preemption merely because they may represent an exercise of the state's police power.[7] We further conclude that the type of flood protection sought by A & W under the facts of this case is not excepted from ICCTA preemption as a necessary repair of a dangerous existing condition, made in the interest of public safety.

## Regulation of Rail Transportation

A & W also argues that its claims will have no significant impact on railway operations and hence do not amount to regulation of rail transportation within the meaning of the ICCTA. A & W makes two arguments under this heading.

6. A & W also relies on *Okla. Corp. Comm'n v. The Burlington N. & Santa Fe Ry. Co.,* in which the court concluded that allowing a railroad to leave a fence along its own right of way in disrepair "would present a hazard to both the landowner and the railroad." 24 P.3d at 372. The court concluded the state regulation requiring maintenance of the fence by the railroad was not preempted by the ICCTA because there was no evidence indicating the maintenance would restrict the railroad's ability to conduct its operations. *See id.*

7. The Railroad argues that A & W is not a legitimate enforcer of the state's police power and that A & W is intent only on "lining its own pockets" through these claims. We have determined that characterization of A & W's claims as ones involving "police power" is not determinative in this case. Accordingly, we need not decide today who may enforce the state's police power when it is at issue.

### Alternative Remedies as Regulation

■ A & W argues first that alternative remedies provide a method of avoiding the preemptive scope of the ICCTA. Specifically, A & W takes the position that the Railroad can avoid *any* impact on its operations by compensating A & W in cash, i.e., through payment of damages. Compensation in this form, according to A & W, would not require construction on the railroad itself. This alternative form of relief would not require shutting the railroad down and thus, A & W argues, would not impact railroad operations at all. We disagree. If A & W were correct, and payment of damages could somehow allow a claim to escape preemption, then no civil claim would ever be preempted. Litigants would be able to circumvent completely Congress's attempt to deregulate the railroad industry. This cannot be the law. Instead, we agree with courts that have stated that when a state requires a railroad to pay damages to a civil litigant for a claim related to the railroad's operations, that claim is the equivalent of state regulation of the railroad. *See, e.g., Guckenberg v. Wisconsin Cent. Ltd.,* 178 F.Supp.2d 954, 958 (E.D.Wis.2001) ("state regulation can be as effectively exerted through an award of damages as through some preventive relief"); *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.,* 297 F.Supp.2d 326, 332 (D.Me.2003) ("awards of damages pursuant to state tort claims may qualify as state 'regulation' when applied to restrict or burden a rail carrier's operations").

Nor can the preemptive scope of ICCTA be circumvented by requiring some sort of specific performance of remedial work to a plaintiff's property. A & W argues that the Railroad can make improvements to *A & W's* property that would remove the risk of flood. It suggests the Railroad could construct a berm, or build a retaining pool, or raise the entire level of A & W's property. In that manner, according to A & W, Railroad operations would not need to be interrupted at all. We reject this "solution" to the preemption issue. Whether the Railroad made these improvements to A & W's property itself or paid to have the work done by others, the cost to the Railroad would constitute regulation of the Railroad just as payment of damages would. A & W points us to no authority that would support ordering a railroad to make improvements to an adjacent landowner's land. We will not sanction such an action to avoid the preemption of A & W's state law claims.

"[T]he remedies provided under [the ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The alternative remedies suggested by A & W are remedies provided, if at all, under state law. As such, they are preempted by the ICCTA, and the trial court correctly granted summary judgment in favor of the Railroad on that basis. *See id.*

### Significance of Impact on Operations

■ Alternatively, A & W asserts that if its claims do impact the Railroad's operations, the impact is not a "significant" economic one. A & W reminds us that the Railroad's affiant testified that rebuilding the culvert at issue would cost more than $500,000. A & W then posits that this amount "represents less than 0.0095% of [the Railroad's] 2003 revenues and less than 0.019% of its 2003 income, *hardly a significant enough extraction to threaten [the Railroad's] continued financial good health.*" (Emphasis added.) Given the summary judgment posture of this case, we must take as true the facts proffered by A & W, the non-movant.[8] However,

---

8. That being said, the page in the record to

which A & W refers us as the basis of the

only reasonable inferences are protected by the summary judgment rules. We question whether the loss of a half million dollars could be insignificant to any business enterprise, regardless of the size of that enterprise. In any event, we can say without hesitation that it is decidedly unreasonable to assume that a railroad would not be significantly impacted by a ruling that could allow an unknown number of landowners to recover a half million dollars each from that railroad for a diminution in the value of their land purportedly caused by its proximity to the railroad. We conclude the summary judgment evidence establishes that the economic impact of allowing this state-law remedy would not be insignificant.

### Rushing v. Kansas City S. Ry. Co.

In its briefing and again at oral argument, A & W relied upon the case of *Rushing v. Kansas City S. Ry. Co.,* 194 F.Supp.2d 493 (S.D.Miss.2001). The *Rushing* opinion addresses two consolidated cases brought by the Rushings against the railroad based upon its operation of a switching station close to their home. The Rushings alleged the station creates unbearable levels of noise and vibration, and that an earthen berm on the railroad's property causes rainwater to pool on their property, causing property damage. They pleaded claims for negligence and nuisance against the railroad. *Id.* at 496–97. The railroad sought dismissal of the consolidated suits on preemption grounds. The trial court concluded the Rushings' negligence and nuisance claims related to noise and vibrations from the operation of the switching station were preempted by the ICCTA. *Id.* at 500–01. The court ruled that these noise and vibration claims represented an attempt "to use state common law to regulate the manner in which the

Defendant conducts operations at its switch yard, which in turn would result in an economic impact on the Defendant." *Id.* at 500.

However, the court ruled that the claims related to the berm and rainwater pooling were not preempted by the ICCTA. The earthen berm was built by the railroad, on its own property, "to reflect and absorb noise emissions originating from the rail yard." *Id.* at 501. The Rushings alleged that the berm was negligently designed and constructed because it caused damage to their property. The court found the design and construction of the berm were *not* directly related to the manner in which the railroad conducted its switching activities. Moreover, efforts to correct the drainage problems "would not implicate the kind of economic regulation Congress was attempting to prescribe when it enacted the ICCTA." *Id.*

We conclude *Rushing* is distinguishable. In *Rushing,* to require the railroad to remedy the pooling of rainwater on Rushing's resulting from the berm would not interfere with the manner in which the railroad conducted its switching activities. However, construction to widen the culvert and bridge would interfere with the Railroad's operations in A & W's case. We conclude *Rushing* does not support A & W's position against preemption in this case. *Accord Maynard v. CSX Transp., Inc.,* 360 F.Supp.2d 836, 843 (E.D.Ky.2004) (plaintiffs' complaints regarding drainage under tracks and at crossings were caused by construction and maintenance of tracks and crossings themselves, and were preempted).

### Conclusion Concerning Preempted Claims

A & W attempts to draw what it calls a preemption "rule" for courts to employ in

---

affiant's calculations indicates the Railroad's net income for 2003 was $12.2 million.

making preemption determinations under the ICCTA. A & W's proposed "rule" would provide:

> [O]nly those state laws that either directly regulate rail operations or that have a significant economic impact on railroads [are] preempted, and that the ICCTA does not preempt state laws enacted under the state's police power that do not directly regulate rail operations and that do not have a significant economic impact on railroads.

We reject A & W's attempt to qualify the directive of the ICCTA in this proposed "rule." The preemption provision of the ICCTA—in all its breadth—is the rule we must employ. To do so, we need not look beyond the clear language of the statute: "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." The question for this Court is whether A & W's claims and the remedies they seek involve "regulation of rail transportation." *See id.* We conclude the Railroad established as a matter of law that they do.

A & W's claims for breach of statutory duty (pursuant to both article 6328 and section 11.086 of the water code), nuisance, negligence, trespass, and injunctive relief are preempted by the ICCTA. Accordingly, the trial court correctly granted summary judgment on those claims, and we overrule A & W's issue insofar as it addresses those claims.

## A & W's Inverse Condemnation Claim

■ A & W filed its Fourth Amended Original Petition on the same day it filed its response to the Railroad's summary judgment motion. The single significant change in the substance of A & W's pleading was the addition of a new claim, titled "Inverse Condemnation," which stated in relevant part:

> *In the alternative, if 49 U.S.C. § 10501(b) prevents Plaintiff from pursuing its state law causes of action and provides no means by which Plaintiff's damages may otherwise be remedied,* the conduct of Defendant Railroad described above constitutes an inverse condemnation and a violation of Plaintiff's constitutional protections against takings, causing the harm sustained by Plaintiff and described below.

(Emphasis added.) As the emphasized language indicates, this claim was specifically pleaded as an alternative to A & W's previously pleaded state law claims made the basis of the Railroad's motion. Thus, this pleading placed an entirely new claim before the trial court. The Railroad did not supplement its motion in any manner to address this alternative cause of action. We cannot affirm a summary judgment on grounds not expressly set out in the motion or response. *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993). Accordingly, we remand A & W's inverse condemnation claim to the trial court for further proceedings. In doing so, we express no opinion on the merits of the remanded claim.

## Conclusion

We affirm the judgment of the trial court that A & W take nothing on its state-law claims for breach of statutory duty (pursuant to both article 6328 and section 11.086 of the water code), nuisance, negligence, trespass, and injunctive relief. However, we conclude the Railroad's motion for summary judgment did not address A & W's inverse condemnation claim. Accordingly, we remand the in-

verse condemnation claim to the trial court for further proceedings.