**REVERSE and REMAND and Opinion Filed March 11, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00856-CV**

**THE KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant**
**V.**
**ANGELA HORTON AND KEVIN HOUSER, Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-06507**

**MEMORANDUM OPINION**

Before Chief Justice Burns, Justice Myers and Justice Carlyle
Opinion by Chief Justice Burns

The jury verdict in this appeal by Kansas City Southern Railroad Company rests on a broad form negligence charge encompassing two theories of liability. KCSR contends one theory of Appellees' negligence claim was preempted by a federal statute and judgment on the second liability theory suffers from a *Casteel* error. We reverse with respect to the preemption issue and remand for further proceedings to allow correction of the *Casteel* error.

1

Appellees' mother, Ladonna Sue Rigsby, was killed when a KCSR train collided with her car while she drove across a railroad crossing near her home. Although the track had been in existence for about 140 years, over the course of many years, KCSR's maintenance incrementally but continually raised it. The crossing was thus humped, with the mid-point rising 30 inches from the level road 30 feet away from the crossing. When the accident occurred, crossbuck signs[1] were posted on each side of the crossing, but yield signs posted several years earlier were missing. Appellees contend KCSR's negligence in failing to maintain or correct the crossing to preclude or eliminate the hump and failing to maintain yield signs at the crossing was a proximate cause of the accident.

KCSR asserted federal preemption as an affirmative defense and requested summary judgment on both theories of appellees' negligence claim, which the trial court denied. KCSR then sought reconsideration of its summary judgment motion but asserted preemption applied only to the humped crossing theory. Without an express ruling on the motion for reconsideration, the case proceeded to trial on both theories of negligence for which a single liability question was submitted to the jury. The jury found both KCSR and Rigsby negligent and equally responsible for the accident, and the court entered judgment awarding KCSR's share of the damages.

---

[1] Crossbuck signs are "X" styled regulatory signs placed at railroad crossings that require drivers to look for and yield to oncoming trains.

On appeal, KCSR asserts 1) the trial court erred as a matter of law in not concluding appellees' claim, to the extent it relied on the humped crossing theory, was preempted by federal law; 2) the evidence was legally and factually insufficient to support a finding that a missing yield sign at the crossing was a proximate cause of the accident; and 3) in the alternative to issue number two, any error with respect to the first issue was harmful because the jury may have premised its verdict on an improperly submitted theory as prohibited by *Crown Life Insurance Company v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). We address each issue in turn.

## A. Preemption of the humped crossing theory

### 1. Procedural posture and standard of review

Pursuant to the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 42 U.S.C. § 10401(b), KCSR asserted preemption as an affirmative defense. *See Mills v. Warner Lambert Co.*, 157 S.W.3d 424, 427 (Tex. 2005) ("Federal preemption is ordinarily a federal defense to the plaintiff's suit but does not ordinarily deprive a state court of jurisdiction." (internal quotation omitted)). Because summary judgment was denied, KCSR bore the burden of proving its defense at trial. *Mo. Pac. R.R. Co. v. Limmer*, 299 S.W.3d 78, 84 (Tex. 2009). The absence of any conclusions or findings regarding preemption require that we presume the trial court resolved all factual disputes against preemption, which in turn requires that KCSR demonstrate its entitlement to the defense as a matter of

law. *Id.*; *see also Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (When party attacks legal sufficiency of adverse finding on issue on which it bears burden of proof, judgment must be sustained absent conclusive evidence establishing all vital facts supporting issue). Because federal preemption of state law presents a legal question, a de novo standard controls. *Grocers Supply, Inc. v. Cabello*, 390 S.W.3d 707, 712 (Tex. App.—Dallas 2012, no pet.).

### 2. ICCTA preemption framework

We discern whether Congress intended federal law to preempt state law by analyzing the federal statute at issue.[2] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."); *A & W Props., Inc. v. Kansas City S. Ry. Co.*, 200 S.W.3d 342, 345–46 (Tex. App.—Dallas 2006, pet. denied); *Burlington N. & Santa Fe Ry. Co. v. City of Houston*, 171 S.W.3d 240, 247 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("Where a statute contains a specific preemption clause, as does the ICCTA, that clause becomes the focus of our analysis."). Although we recognize the presumption

---

[2] In interpreting a federal statute, we are "obligated only to follow the . . . decisions of the United States Supreme Court and the Texas Supreme Court." *Legend Airlines, Inc. v. City of Fort Worth*, 23 S.W.3d 83, 92 (Tex. App.—Fort Worth 2000, pet. denied). We, however, see no conflict between decisions of the courts whose precedent is controlling and those of courts whose decisions are nonbinding but nonetheless analogous and therefore persuasive, and thus reference both binding and nonbinding decisions above.

against preemption, it "applies with less force when Congress legislates in a field with 'a history of significant federal presence'" such as railroads. *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)).

Congress enacted the ICCTA primarily to address concerns regarding state economic regulations impacting rail transportation. *Id.* at 805 (discussing legislative history regarding bill). The statute provides for exclusive federal jurisdiction over state or local action, that has the effect of regulating rail transportation. Federal and state courts have recognized the breadth of the ICCTA's preemption: "it is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *Burlington N. & Santa Fe Ry. Co.*, 171 S.W.3d at 247 (quoting *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F.Supp. 1573, 1581 (N.D. Ga. 1996)). The ICCTA's preemption provision provides:

> (b) the jurisdiction of the [Surface Transportation] Board over—
>
>> (1) transportation by rail carriers, and the remedies provided in this act with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers;[3] and
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching or side tracks,

---

[3] The dissent questions whether rail crossings constitute rail "facilities." We, however, confine our review to the arguments fairly raised. *Victoria Gardens of Frisco v. Walrath*, 257 S.W.3d 284, 290 (Tex. App.—Dallas 2008, pet. denied) ("We will not affirm the trial court's order based on a legal theory not presented to the trial court and to which Victoria Gardens had no opportunity to respond."). For the same reason, we find no basis for inquiring as to the effect of the Fixing America's Surface Transportation Act.

> or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. *Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.*

42 U.S.C. § 10501(b) (emphasis added).

The exclusive remedies provision of the statute—the statute's second sentence—defines the scope of its preemption. *Id.*; *Elam*, 635 F.3d at 806. Thus, on its face, the statute expressly preempts laws that have the effect of managing or governing rail transportation, and similarly, remedies provided under federal or state laws that have the same effect. 42 U.S.C. § 10501(b); *Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 532 (5th Cir. 2012) ("[E]nactments that have the effect of managing or governing, and not merely incidentally affecting, rail transportation are expressly or categorically preempted under the ICCTA." (internal quotation omitted)); *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404 (5th Cir. 2010). Preempted remedies include more than those provided by statutes or regulations. "[W]hen a plaintiff's tort claim directly attempts to manage or govern a railroad's decisions in the economic realm, that claim is either wholly federal or nothing at all." *Elam*, 635 F.3d at 807 (concluding negligence per se claim premised on violation of anti-blocking statute and train that blocked intersection at which collision occurred was expressly preempted) (internal quotation omitted)); *A & W*

*Props., Inc.*, 200 S.W.3d at 351 (concluding landowner's negligence and related claims arising from railroad's refusal to widen its bridge and culvert to preclude flooding on plaintiff's land were preempted, where requiring widening operations or permitting damages if work was not performed, was effectively "regulation of rail transportation").

In addition, state laws, including tort laws, are preempted if the law, as applied, has the "effect of unreasonably burdening or interfering with rail transportation." *Elam*, 635 F.3d at 805; *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 333 (5th Cir. 2008) ("[P]reemption claims in routine crossing cases fall into the category of as-applied preemption challenges."). Thus, rather than focusing on the purpose of state negligence laws that unquestionably aim at compensating injured parties, our preemption analysis focuses on *the effect* of a negligence claim.[4] *Elam*, 635 F.3d at 805.

Moreover, this Court has already rejected the distinction between a forward-looking "fix" (i.e., an injunction compelling correction of hazardous or problematic

---

[4] We find little persuasive value in *Guild v. Kansas City Southern Railway Company*, 541 F. App'x 362 (5th Cir. 2013) or *Gallo v. Union Pacific Railroad Company*, 372 F. Supp. 3d 470, 480–81 (W.D. Tex. 2019), cited by our dissenting colleague, since neither involved a humped crossing accident, let alone a crossing claim.

condition) and damages for past conduct as the fulcrum upon which prohibited "regulation" and thus preemption rests. "If A & W were correct [that an award of damages rather than injunctive relief would exempt its claims from preemption], and payment of damages could somehow allow a claim to escape preemption, then no civil claim would ever be preempted." *A & W Props., Inc.*, 200 S.W.3d at 349; *see also Pejepscot Indus. Park, Inc. v. Main Cent. R. Co.*, 297 F. Supp. 2d 326, 333–34 (D. Me. 2003) ("[T]his Court joins other courts in recognizing that awards of damages pursuant to state tort claims may qualify as state 'regulation' when applied to restrict or burden a rail carrier's operations."); *S.D. ex rel. S.D. R.R. Auth. v. BNSF Ry. Co.*, 280 F. Supp. 2d 919, 935 (D.S.D. 2003) (tort claims for punitive damages and tortious interference completely preempted).

We thus determine whether KCSR met its burden to demonstrate that appellees' humped crossing claim had the effect of managing or regulating KCSR's economic decisions, or if the effect of the claim unreasonably burdened or interfered with KCSR's rail operations.

### 3. Facts related to the humped crossing claim

The track was constructed between 1871 and 1880. Ownership changed numerous times, and in 1992 KCSR acquired control of the track. Periodically over the years, KCSR would add small amounts of ballast under the tracks to level them or ensure they were well-supported, which caused a gradual increase in the slope of

the crossing. In 2013, KCSR dug out all the ballast under the crossing, tamped it down, laid a new track panel and resurfaced it, but did not reduce the crossing's slope. The photo below accurately depicts the crossing on the date of the accident.



In accordance with federal law, KCSR's responsibility for the crossing ends approximately two feet outside of each rail. Beyond that space, even though the approach lies within KCSR's right of way, Hunt County, Texas, was responsible for and controlled any maintenance or changes to the road. KCSR, on the other hand, was responsible for maintaining the crossing surface over the railroad ties and up to the outside perimeter of the railroad ties.

At trial, appellees argued KCSR was negligent because the pavement approaching the crossing sloped excessively, thereby creating the hump. Appellees

asserted the hump was a safety hazard because the steep grade impaired visibility and was a distraction that limited Rigsby's attention in looking for an approaching train. Appellees argued that in the 30-foot span over and reaching equally both sides of the crossing, no more than a three-inch slope should exist, relying on guidelines[5] provided by the American Railway Engineering and Maintenance-of-Way Association (AREMA). Compliance with those guidelines would have required lowering the crossing by at least 32 inches. Appellees presented two options for conforming the crossing to the AREMA recommendation: 1) leveling and raising the roadway in the approach to and retreat from the crossing; or 2) lowering the tracks at the crossing. Appellees argued KCSR was negligent in having failed to undertake either of these two options.

KCSR asserted it lacked the authority to accomplish the roadway option. Reducing a slope of 32 inches to a slope of 3 inches within a 30-foot span would require raising the slope of the road over a distance of 300 feet—three-inch increases over ten 30-foot sections. KCSR's right-of-way, however, extended only 25 feet from the center of the rails, and KCSR established it lacked the legal right to alter the entirety of the roadway in this manner to eliminate the hump.

---

[5] Appellees' counsel referred to the AREMA provisions as "regulations" and "standards," while KCSR's witness referred to them as desirable "recommendations" or "guidelines." Because counsel's description was not evidence, we utilize the description provided by the witness.

The parties disputed the cost and extent of work required to lower the crossing by lowering the track. Although deposition testimony was admitted on cross-examination in which appellees' expert testified he would not quibble with an estimate of $300,000 to perform the work, at trial, he also testified rehabilitating the crossing would cost between $50,000 and $150,000.

KCSR's corporate representative, who had extensive experience supervising track maintenance and rehabilitation projects, testified lowering the track would require major revision to the alignment, elevation, or profile of the track. In this regard, appellees' expert admitted conforming to applicable Federal Railway Administration Track Safety standards and preventing a dip caused by grading out the hump would require undercutting,[6] and running out—leveling—work in the approach to and beyond the crossing for a minimum of 661 feet on each side of the crossing. KCSR's witness testified that hills and curves near the crossing would create further complications and expenses and require extending the run-out beyond 661 feet on each side of the crossing. Finally, KCSR's witness testified that water flows under the crossing through a 33-foot-long, 36-inch diameter culvert, which also maintains uniform water levels on both sides of the crossing. The culvert and

---

[6] The rock underlying the crossing would require use of a giant chainsaw-like machine to undercut the ballast. A normal grading procedure utilizing undercutting would require cutting out the asphalt six–feet from both sides of the rail, cutting the rail out in the same stretch, using machinery to remove the track panel, laying new ballast and smoothing it with a tamping machine, returning the track or laying new track, and paving the new crossing.

concerns about flooding thus further complicated the lowering/undercutting option. KCSR argues that providing a remedy to appellees for the condition of the crossing has the effect of managing its operations, and the claim is accordingly preempted.

### 4. ICCTA preemption in this case

#### i. Cases specifically addressing humped crossing claims

Every court that has addressed preemption related to a tort claim or regulation involving a humped crossing has concluded the ICCTA preempts the claim.[7] *See CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 283–84 (6th Cir. 2019); *Waneck v. CSX Corp.*, No. 1:17CV106-HSO-JCG, 2018 WL 1546373, at 5 (S.D. Miss. Mar. 29, 2018); *Union Pac. R.R. Co. v. Taylor Truck Line, Inc.*, No. 15-0074, 2018 WL 1750516 (W.D. La. April 10, 2018); *Voight v. CSX Transp., Inc.*, No. 3:17-CV-01018-N (N.D. Tex. June 19, 2017) (mem. op.). Appellees, like our dissenting colleague, take issue with each of these cases but notably fail to cite a single case involving maintenance of or a tort claim arising from a humped crossing in which preemption was rejected.[8] The absence of any such supporting authority speaks

---

[7] Despite the dissent's criticism of our reliance on the cases discussed below, we nonetheless include an undeniable fact in addressing the claim at issue: no other court that has addressed a tort claim arising from a humped crossing claim has reached the result advocated by appellees and the dissent. Moreover, our citation to cases which rely on implied preemption, for instance *Union Pac. R.R. Co. v. Taylor Truck Line, Inc.*, No. 15-0074, 2018 WL 1750516 (W.D. La. April 10, 2018) provides no basis for rejecting preemption of the humped crossing claim at issue here or ignoring persuasive authorities merely because some courts relied on implied rather than express preemption, or vice versa, particularly given evidence of different costs, delays, and burdens potentially involved.

[8] The dissent leans heavily on the STB's "helpful guidance" regarding the ICCTA's preemption of the humped crossing claims addressed in *Voight* and *Waneck*. We observe, however, that the STB's guidance

loudly. As discussed below, we reject appellees' and our dissenting colleague's effort to distinguish these cases.

We consider first those cases most closely aligned with our facts. In *Voight*, the court concluded claims that alleged CSXT had failed to maintain a crossing that was steep and therefore hazardous fell squarely within the ICCTA as having the effect of managing or governing rail transportation economically. *Voight*, No. 3:17-CV-01018, at *6. Likewise, in *Waneck*, the court concluded improper maintenance claims premised on a humped crossing were "in actuality claims concerning the physical characteristics of the . . . crossing, including the configuration, operation, and maintenance of the crossing and related rail structures," and as such were completely preempted. 2018 WL 1546373, at *4. Notably, both cases arose out of collisions when a bus became high-centered on a humped crossing. *Id.* at *5 (negligence claim premised on maintenance whereby railroad added layer upon layer of asphalt patches to crossing thereby creating dangerous humped crossing was

---

involved a question not presented by the parties or record: the interplay between FRSA preemption and the ICCTA. Moreover, the STB itself qualified its advisory-only guidance, as follows:

> The Board [in its May 23, 2018 opinion] reasonably provided guidance to assist 'the court and the parties,' noting relevant precedent involving the interplay between § 10501(b) and FRSA preemption. . . . That guidance explains the Board's view of the preemption issue, but it is not binding or controlling in these cases, as the preemption issues are properly before the district courts (or potentially the relevant courts of appeals) and those courts have concurrent jurisdiction to determine preemption."

*Jimmy Lee Waneck & Starr Swearingen Waneck, et al-Petition for Declaratory Order*, FD 36167, 2018 WL 5723286, at *4 (S.T.B. Oct. 31, 2018).

tantamount to claim regarding design and construction of the crossing and thus preempted by ICCTA); *Voight*, No. 3:17-CV-01018, at *2 (negligence claim arising from accident in which tour bus high-centered on railroad crossing and was struck by train).

Appellees counter KCSR's reliance on *Waneck*, and *Voight*, by arguing both involved rail safety claims, which are not automatically preempted.[9] But that argument misses the distinction made in *Waneck* and inapplicable here. The court in *Waneck* held claims premised on improper maintenance were preempted by the ICCTA. *Waneck*, 2018 WL 1546373, at *5. It could not conclude, at the motion to dismiss stage, that the "safety issues" inherent in an alleged breach of its duty to operate its train at a safe speed, ability and preparedness to slow or stop for hazards, etc., were preempted by FRSA. *Id.* at *6.

Nor does the surplus holding in *Voight*, that a judgment in the plaintiffs' favor would also have unreasonably burdened or interfered with rail transportation in the economic realm, compel a different result. The initial holding premised on the ICCTA's express preemption of remedies that regulate rail transportation suffices to

---

[9] *Compare* ICCTA to regulation of rails safety claims provided by the Federal Railroad Safety Act, 49 U.S.C. § 20106, which expressly excludes preemption for actions under state law which seek damages for personal injury, death, or property damage premised on instances when a defendant has failed to comply with safety regulations. As noted below, neither party raised the FRSA or its preemption provision.

–14–

support the decision in *Voight* and preemption here.[10] The claims asserted in *Voight* and *Waneck* are functionally indistinguishable from appellees' claims.[11]

Similarly, appellees' efforts to distinguish *Taylor Truck Line, Inc.* fail to persuade. In that case, a negligence claim was asserted against the railroad following a collision between a train and a truck, after the truck high-centered on a humped crossing. 2018 WL 1750516, at *1–2. The railroad sued for damages to the train and track, and the truck company alleged the railroad was comparatively negligent

---

[10] Nonetheless, even relying solely on appellees' expert's cost estimate for undercutting, given the amount, the expanse of track involved, the culvert, hills and curves, and the possibility of the same outcome in other humped crossing claims asserted in the future by other plaintiffs, we see no basis to conclude that the interference was anything but unreasonable. *See A & W Props., Inc.*, 200 S.W.3d at 349–50 (questioning whether loss of half a million dollars would be insignificant to any business enterprise, regardless of size, and concluding "without hesitation that it is decidedly unreasonable to assume that a railroad would not be significantly impacted by a ruling that could allow an unknown number of landowners to recover a half million dollars each from that railroad for a diminution in the value of their land purportedly caused by its proximity to the railroad").

[11] The dissent relies on *Minton v. Paducah & Louisville Railway, Inc.*, 423 F. Supp. 3d 375, 383 (W.D. Ky. 2019) in attempting to diminish the import of *Voight* and *Waneck*. But *Minton's* holding does little to support the dissent or weaken the persuasive value of either *Voight* or *Waneck*. Instead, *Minton* disagreed with *Voight* and *Waneck* regarding whether "complete" or "ordinary" (defensive) preemption existed for a crossing accident that involved, but did not rely on, a humped crossing. *Id.* at 383 ("The Court acknowledges that *Voight* and *Waneck* conflict with the undersigned's decision today. However, the Court finds that these cases are inconsistent with Sixth Circuit and Supreme Court law on *complete preemption* and declines to adopt them.") (emphasis added). The distinction was important in *Minton*, as in *Voight*, because ordinary (defensive) preemption does not provide federal question jurisdiction in a case removed to federal court. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *Barrois*, 533 F.3d at 330–31 (Under complete preemption, apparent state law claim is converted to claim arising under federal law for jurisdictional purposes because federal statute wholly displaces state law claim. Comparatively, ordinary preemption "declares the primacy of federal law, regardless of the forum or the claim."). We of course need not decide that complete preemption exists to decide that, at a minimum, defensive preemption bars appellees' claims. Indeed, the *Minton* court recognized the same thing: "Preemption under the ICCTA may be a defense to Plaintiff's negligence action, but whether that is so is an issue for the Grayson Circuit Court to decide." *Id.* Thus, any error in *Voight*, *Waneck*, or *Minton* in determining whether complete preemption created federal question jurisdiction gives us no pause in deciding that, whether by complete or defensive preemption, the effect of appellees' claim is governance of KCSR's operations through regulation of the grade and manner of the crossing's maintenance.

in failing to maintain the crossing without a hump. *Id.* at \*4. The court determined the truck company's affirmative defense was impliedly but completely preempted, because the truck company asserted

> that the Crossing has been raised over the years, and Union Pacific has failed to repair it. If the Taylor Entities are correct, then Union Pacific would be required to make changes to the Crossing that would require considerable reconstruction.

*Id.* at \*7.

Appellees argue the holding rested on the cost of the work—approximately $2,000,000—the disruption to rail traffic necessitated by closing at least five other crossings for three or four days, and different safety hazards created by lowering the crossing. Thus, appellees again rely on the unreasonable burden aspect of the claim. In concluding the claim was preempted, however, the court recognized the truck company disputed the burden and cost inherent in the work and acknowledged the truck company's characterization of that work as rehabilitation rather than reconstruction, but relied on the admission by the truck company's expert that "'the defense concerns the design of the railroad tracks and crossing' . . . [and] 'considerable redesign and reconstruction work.'" *Id.* at \*8. The court also discussed an STB decision in which express and implied preemption existed because the claim at issue had the effect of regulating and interfering with rail transportation and also concluded the claim "'further . . . unduly burden[ed] interstate commerce and amount[ed] to impermissible state regulation of [the railroad's] operations by

–16–

interfering with the railroad's ability to uniformly design, construct, maintain, and repair its railroad line.'" *Taylor Truck Line, Inc.*, 2018 WL 1750516, at \*8 (quoting *Thomas Tubbs—Petition for Declaratory Order*, STB Docket No. FD 35792, 2014 WL 5508153, at \*5 (S.T.B. Oct. 31, 2014)). Thus, while the court appeared to also rely on the unreasonable burden with rail transportation arising from the claim, no doubt exists as to its reliance on the same concept at play here: a claim that has the effect of managing rail transportation by interfering with the design and maintenance of a crossing.

We also reject appellees' and the dissent's challenges to KCSR's reliance on *City of Sebree* in which the Sixth Circuit concluded the ICCTA preempted a city ordinance and settlement agreement that prohibited the railroad from performing surfacing maintenance by raising a crossing, which the railroad preferred to the more expensive and disruptive undercutting method. 924 F.3d at 281. The court determined the regulation and settlement agreement were preempted on several grounds, including that the breadth and uncertainty of the regulation could force CSX to use a maintenance method—undercutting—that imposed an unreasonable burden on CSX. *Id.* at 284–85. And, allowing enforcement of the local regulation interfered with CSX's ability to "uniformly design, construct, maintain, and repair its railroad line." *Id.* at 285. In the same way, allowing a jury to determine the

manner and extent of maintenance required at the crossing interferes with KCSR's ability to homogenously control maintenance of its tracks.

Appellees differentiate *City of Sebree* by arguing the regulation at issue had already been used to deny CSX the ability to perform maintenance by raising the crossing grade, and in comparison, no regulation or ordinance had prevented KCSR from correcting the high grade at the crossing. But that argument highlights the point of preemption: the doctrine should preclude interference before it occurs.

The dissent further distinguishes *City of Sebree* on the basis that the plaintiffs in that case relied on negligence per se, while appellees relied only on industry standards, a distinction we find irrelevant. The dissent also observes that the *City Sebree* court determined the ordinance at issue was susceptible to use as a pretext for interference in rail service and lacked standards cabining the city council's discretion, problems not present here. *Id.* at 284. But the dissent ignores the second basis for preemption relied upon in *City of Sebree*: "Because the Ordinance has the effect of prohibiting CSX from using the maintenance method it prefers and believes is the 'industry best practice,' and instead requires the use of a method that 'reduces train safety,' [undercutting] it has the effect of unreasonably interfering with rail operations." *Id.* at 285. The same is true here. We conclude the holding and analysis in *City of Sebree* are persuasive.

### ii.     Typical and routine crossing claims

In addition to disputing the applicability of the humped crossing cases relied upon by KCSR, appellees argue KCSR's underlying analysis incorrectly assumes preemption applies to typical crossing cases and improperly relies on Fifth Circuit precedent that does not support its argument.  We consider each of appellees' arguments below.

First, we address appellees' arguments rejecting preemption in "typical" or "routine" tort cases arising from crossing accidents.  Appellees provide a truncated portion of a quote from *Barrois*, 533 F.3d at 333, arguing "the care of grade crossings is peculiarly within the police power of the states."  But the entirety of the quote supports our statement of the law and conclusion:

> The care of grade crossings is peculiarly within the police power of the states, and, if it is seriously contended that the cost of this grade crossing is such as to interfere with or impair economical management of the railroad, this should be made clear.  It was certainly not intended by the Transportation Act to take from the states or to thrust upon the Interstate Commerce Commission investigation into parochial matters like this, *unless by reason of their effect on economical management and service, their general bearing is clear.*

*Id.* (quoting *Lehigh Valley R.R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 35, (1928) (citations omitted) (emphasis added)).  Thus, while true that routine "[c]rossing disputes, despite the fact that they touch the tracks in some literal sense . . . do not fall into the category of 'categorically preempted' or 'facially preempted' state actions," *Id.* at 332–33, "routine" is key.  In routine cases, maintenance of the

–19–

track and the costs and burden to eliminate the alleged structural cause of an accident are not at issue as here. "[R]outine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks." *Id.* at 333 (quoting *Maumee & W. R.R. Corp. & RMW Ventures, LLC–Petition for Declaratory Order*, STB Finance Docket No. 34354, 2004 WL 395835, at *2 (S.T.B. March 2, 2004)). For instance, in *Barrois*, the railroad sued to preclude property owners from installing private use crossings over the track. *Id.* at 325. The court determined complete preemption did not apply and held the railroad had failed to carry its burden regarding *as-applied* preemption. *Id.* at 333–34. Appellees, however, do not present a routine crossing case, and thus *Barrois* has limited application.

Moreover, despite appellees' assertion, KCSR does not rely on "general evidence that rail crossings affect rail transportation." *C.f. Franks Inv. Co.,* 593 F.3d at 415 (railroad failed to connect evidence regarding drainage, track maintenance costs, and reduced speed issues to crossings at issue). It relies on the specific crossing at issue and the specific remedies sought by appellees, which seek to impose liability for KCSR's prior failure to correct the humped crossing, which KCSR contends has the effect of regulating rail transportation.

Appellees also take issue with KCSR's reliance on *Texas Central Business Lines*, which involved enforcement of a local ordinance requiring a crossing slope of no more than 4:1, rather than the steeper 3:1 and 2:1 grades at the challenged crossings, which were within industry standards. *Tex. Cent. Bus. Lines*, 669 F.3d at 533. Appellees assert, in contrast, the grade at the crossing exceeded industry recommendations, and argue no grading ordinance exists here. As KCSR observes, however, appellees seek a slope that meets the AREMA guidelines, a comparable paradigm to the regulation at issue in *Texas Central Business Lines*. Nonetheless, preemption does not depend on the mechanism by which interference occurs— whether by regulation or tort claim—or the degree to which the crossing complies with or varies from a standard set by a regulation or a common law duty of care. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[S]tate regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."); *A & W Props., Inc.*, 200 S.W.3d at 349 ("[W]hen a state requires a railroad to pay damages to a civil litigant related to the railroad's operations, that claim is the equivalent to state regulation of the railroad."); *see also In re Katrina Canal Breaches Consol. Lit.*, No. 05-4182, 2009 WL 224072, at *6 (E.D. La. Jan. 26, 2009) ("The application of state law negligence principles to assess and evaluate the suitability of the design and

construction of a railroad crossing, railroad tracks, and roadbed for railroad tracks qualifies as an attempt at state law 'regulation' in respect to rail transportation."). Rather, it turns on whether a local regulation conflicts with an activity governed by the ICCTA, such as an express conflict regarding construction of rail lines as in *Texas Central Business Lines*, 669 F.3d at 533, or, whether the effect of a claim, as applied to the circumstances at hand, is regulating, economically through a damage award, the grade and manner of maintenance at a crossing.[12]

### iii.    *Elam* does not mandate the absence of preemption here

We also disagree with appellees' argument that KCSR (and this Court) ignores precedent by relying on *Elam.* On the contrary, the portion of the *Elam* decision that rejected preemption for a simple negligence claim has no bearing here, given the difference in the facts supporting KCSR's preemption argument and the facts at issue in *Elam.* In *Elam*, the Fifth Circuit concluded preemption applied to a strict liability claim arising from violation of a Mississippi anti-blocking statute that regulated train length, speed, and how long a train could occupy a crossing because

---

[12] Nor do we see any meaningful distinction between the direct influence on the permissible grade and manner of maintenance at issue here and the direct effect of the regulation at issue in *Texas Central Business Lines* on "where rail lines could be situated, as well as . . . the distance between railroad tracks and the position of track-side equipment." As the dissent correctly observes, the regulation at issue in *Texas Central Business Lines* fell within the STB's exclusive jurisdiction over the "construction . . . of spur, industrial, team, switching, or side tracks, or facilities." *Tex. Cent. Bus. Lines. Corp.*, 669 F.3d at 533. The court also observed, that as here, "ordinances that would apply to the *slope or other features of the embankments for the railroad tracks*" are expressly preempted. *Id.* (emphasis added). Thus, whether we rely on an ordinance or a jury verdict for determining the permissible slope of a crossing or an embankment, we nonetheless deal with regulation of construction or operations.

the effect of the claim was economic regulation of the railroad's switching operations. *Id.* at 807. In comparison, on the bare removal record presented, the court concluded the simple negligence claim premised on the stalled train blocking the crossing was not preempted. *Id.* at 813. The court determined KCSR, which was also the defendant in *Elam*, had not demonstrated that providing adequate warnings of the train's presence on the crossing in an affidavit that asserted "limiting the amount of time a train could block a crossing" or "otherwise regulating how KCSR uses the tracks in switching" would "directly impact KCSR's operation..." Although the affidavit addressed the burdens of the challenged anti-blocking statute, it did not address the burdens of providing adequate warnings *at the crossing* where the accident occurred and did not demonstrate an unreasonable burden arising from application of the statute. *Id.* at 814. Here, KCSR did not rely solely on the unreasonable burden regarding the time, cost, and effort involved in correcting the hump. It argued the claim constituted a local regulation requiring KCSR to undertake a major redesign and renovation of the crossing and the adjacent track, which had the effect of managing its operations.

Like each court presented with a claim premised on failure to properly maintain or reconstruct a humped crossing, we conclude ICCTA preemption

prohibits judicial resolution of appellees' humped crossing claim.[13]  We sustain KCSR's first issue.

## B.  Sufficiency of the evidence supporting the yield sign theory and *Casteel* error

In its second issue, KCSR argues the evidence was legally and factually insufficient to support a finding that the absence of a yield sign at the crossing was a proximate cause of the collision.  In the alternative, KCSR argues that if sufficient evidence supported the absence of a yield sign as a cause of the accident to support submission to the jury, the trial court erred in submitting both theories in one broad-form question.  It asserts the manner of submission was harmful, given preemption of the humped crossing theory of the claim.  We agree with KCSR's alternative argument.

### 1.  Standard of review governing sufficiency of the evidence

An appellant challenging the legal sufficiency of the evidence on an issue on which it did not have the burden of proof must demonstrate no evidence supports the adverse finding.  *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).  In reviewing such a challenge, we consider the evidence in the light most favorable to the verdict and "credit favorable evidence if reasonable jurors could and disregard

---

[13] We need not specifically determine, as appellees suggest, whether KCSR should have attempted to compel Hunt County to grade the road, or, obtained permission to do the work at its own expense, because requiring either action would involve regulation of rail transportation, just as proceeding with the undercutting option would.

contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005). If more than a scintilla of evidence supports the finding, the no evidence challenge fails. *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 463 (Tex. App.—Dallas 2005, no pet.).

In contrast, a factual sufficiency complaint challenging an adverse finding on an issue on which the appellant did not have the burden of proof requires a demonstration that insufficient evidence supports the adverse finding. *Id.*, at 58; *Croucher*, 660 S.W.2d at 58. In reviewing such a challenge, we consider and weigh all of the evidence and set aside the verdict only if the evidence is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *United Servs. Auto. Ass'n*, 175 S.W.3d at 463. We regard the jury's verdict as conclusive if the record includes conflicting evidence. *Id.* Thus a finding supported by sufficient competent evidence of probative force mandates overruling a factual sufficiency challenge. *Id.*

## 2. Evidence supporting the absent yield sign theory

Appellees' evidence demonstrated that, as required by a master agreement with the Texas Department of Transportation, years before the accident KCSR had installed yield signs on the same posts as the crossbuck signs posted on each side of the crossing. KCSR failed to maintain the yield signs, however, and at the time of the collision, they were missing.

According to appellees' expert, crossbuck signs provide notice to drivers of a railroad crossing and even in the absence of other warnings like lights, alert drivers to look for an approaching train before entering a crossing. Appellees' expert testified yield signs enhance a driver's recognition of a hazard, given that motorists do not necessarily view crossbuck signs as providing such notice. The expert also testified that because yield signs at crossings became legally required in 2009, the presence of a yield sign would more likely than not have made a difference at the crossing, although he could cite no studies supporting his opinion. KCSR disputes the import of this testimony, arguing the expert's opinion was speculative and constituted no evidence or insufficient evidence, given the conclusion in a study admitted into evidence that reported the absence of any substantive evidence regarding how yield signs may affect driver behavior at grade crossings. The same study, however, also indicated that "yield signs . . . convey . . . the message that the driver has the responsibility to look for and yield to an oncoming train better than it [sic] does the crossbuck alone." Additionally, the expert testified that although no studies showed whether yield signs coupled with crossbucks reduced crash rates, studies did show the benefits of yield signs. Although KCSR also relied on evidence that drivers pay less attention to warning signs the more familiar they are with the crossing where the signs are located, appellees' expert countered by testifying that

although Rigsby had lived near the crossing for many years, because of a recent illness, she was driving for the first time in two months when the accident occurred.

Questions related to the quality of the information relied upon by an expert generally address weight rather than admissibility. *Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.—Houston [1st Dist.] 1995, no writ). Here, the jury was the sole judge of the weight to which appellees' expert's testimony was entitled. *Melvin v. Jimenez*, No. 04-00-00746-CV, 2002 WL 21963, at *2 (Tex. App.—San Antonio Jan. 9, 2002, no pet.) ("[W]e defer to the jury's determinations on the credibility of the witnesses, the weight to be afforded to the testimony, and its resolution of conflicts in the evidence.") (not designated for publication). Viewing this evidence in the light most favorable to the jury's verdict,[14] we conclude more than a scintilla of evidence supports the existence of cause in fact arising from the absent yield sign. *See Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (conflicting evidence demonstrates legally and factually sufficient evidence); *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 862–63 (Tex. App.—Austin 2001, pet. denied) (appellate court will not substitute its judgment for the

---

[14] We question KCSR's assertion that expert testimony was necessary to establish the missing yield sign as a cause of the accident. *See Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 591 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("Non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." (internal quotation omitted)). We need not reach a conclusion on this issue, however, given our determination regarding the sufficiency of the evidence provided by appellees' expert.

jury's when the verdict rests on sufficient evidence). We overrule KCSR's second issue.

### 3. Broad-form submission of one question encompassing humped crossing and missing yield sign theories

Appellees submitted evidence and argument regarding both theories of negligence. During trial, KCSR submitted a proposed jury question that separated liability premised on the humped crossing theory from the absent yield sign theory. At the charge conference, KCSR objected to submission of the proposed negligence question and asserted that since one theory of the claim was barred by preemption, submitting a broad-form question created a *Casteel* error. Nonetheless, the broad-form liability question submitted to the jury asked whether the negligence of Rigsby or KCSR caused the occurrence in question. Following the jury's verdict and entry of the judgment in favor of Rigsby, KCSR filed a motion for judgment notwithstanding the verdict and again asserted the humped crossing theory was preempted as a matter of law. KCSR's third issue on appeal tracks its objection and JNOV motion.

In support of this issue, KCSR, relying on *Casteel* and derivative cases, argues Texas law presumes harmful error when a single broad-form liability question commingles valid and invalid liability theories and a proper reason for the verdict cannot be ascertained from the record. Appellees respond that in *Casteel*, impermissible claims were comingled with valid ones, while the issue here rests on

a single cause of action.  *Casteel*, 22 S.W.3d at 387–88 (five theories of liability arising from DTPA for which plaintiff lacked consumer status commingled with claims for negligence, breach of fiduciary duty, etc.).  Appellees also point to two decisions from our sister courts in support of their reading of *Casteel*, *Columbia Medical Center of Las Colinas v. Bush*, 122 S.W.3d 835, 858 (Tex. App.—Fort Worth 2003, pet. denied), and *Formosa Plastics Corp. v. Kajama International, Inc.* 216 S.W.3d 436, 455 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied), as well as one decision from the Texas Supreme Court, *Dillard v. Texas Electric Cooperative*, 157 S.W.3d 429, 434 (Tex. 2005).  We begin with *Casteel*.

As KCSR asserts, *Casteel* determined that broad-form submission of legally invalid theories—liability pursuant to various provisions of the DTPA where plaintiffs were not consumers—with legally valid theories, was reversible error where the court could not determine the theory on which the jury's verdict rested. 22 S.W.3d at 389.

> It is essential that the theories submitted be authorized and supported by the law governing the case.  If they are not, the appellate court must, at a minimum, be able to determine whether properly submitted theories constituted the basis of the jury's verdict.

*Id.*  The holding was not limited to valid claims and instead, prohibited broad-form submission of invalid theories.  *Id.*; *see also, Benge v. Williams*, 548 S.W.3d 466, 475 (Tex. 2018) ("[W]hen the question allows a finding of liability based on evidence that cannot support recovery, the same presumption-of-harm rule [stated in

–29–

*Casteel]* must be applied."); *Tex. Comm'n on Human Rights v. Morrison*, 381 S.W.3d 533, 534–35 (Tex. 2012) (per curiam) ("In this employer retaliation case, a broad-form jury question allowed the jury to find liability based on a legal theory that was jurisdictionally barred and thus could not support liability. As in Casteel, we cannot determine whether the jury relied on the invalid theory."). We have the same dilemma here. We cannot determine whether the jury rested its liability determination on appellees' preempted humped crossing theory, which should not have been submitted, or the missing yield sign theory. Accordingly, we follow *Casteel's* holding.

> When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.

*Id.*

Although we recognize that *Columbia Medical Center* facially supports appellees' contrary argument, we decline to interpret it as conflicting with *Casteel*. In that medical malpractice case, the Fort Worth court rejected a *Casteel*-based challenge premised on submission of a single broad-form negligence question, where the appellant argued that several of the alleged negligent acts lacked supporting evidence. 122 S.W.3d at 857–59 ("Even if the specific acts of negligence alleged might be considered separate 'theories of liability,' in this case, unlike in *Casteel,* no valid theories of recovery were commingled in a listing with invalid

theories of recovery in the broad-form question; thus, no charge error occurred."). The objection at issue[15] in *Columbia Medical Center* was whether each theory was supported by factually sufficient evidence, rather than whether each theory was legally valid. *Columbia Med. Ctr. of Las Colinas*, 122 S.W.3d at 857–59. Here, instead of factual sufficiency, we are presented with a liability theory the ICCTA rendered legally impermissible for a jury to decide, and a theory properly submitted to the jury.

Finally, we perceive nothing in *Dillard*, 157 S.W.3d at 434, or *Formosa Plastics Corporation*, 216 S.W.3d at 455 supporting a different conclusion. *Dillard* does not address *Casteel* error, and instead holds that jurors need not agree on every fact supporting a negligence finding if they all agree that negligence occurred. *Dillard*, 157 S.W.3d at 434.

*Formosa*, more like *Columbia Medical Center* than *Casteel*, involved five construction contracts in which Kajima International asserted Formosa made fraudulent statements. 216 S.W.3d at 455. One fraud question was submitted to the jury and Formosa argued on appeal that the absence of "separate answer blanks for each contract makes it impossible to trace the jury's damage award back to any

---

[15] Importantly, the appellant in *Columbia Medical Center* did not object to submission of the broad-form question. *Id.* at 858, n.9. Thus, because the error was waived, the entire discussion regarding error with respect to the jury question is arguably dicta. *See* TEX. R. CIV. P. 274; *In re A.V.*, 113 S.W.3d 355, 358 (Tex. 2003) ("[O]ur law on preservation of error does not permit . . . review of unpreserved" charge error, which is waived where appellant fails to object to the charge in the trial court).

specific contract or contracts and prevents Formosa from challenging the sufficiency of the evidence as to any of the individual contracts." *Id.* The court rejected the argument, concluding "the underlying conduct upon which the jury found liability was essentially the same for all five of the contracts at issue." *Id.* It thus determined that any error with respect to submitting potential liability under any of the contracts for which insufficient evidence existed was harmless, because the court was "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Id.* The holding has little application here, where we deal with a legally invalid theory premised on underlying conduct completely distinct from the valid missing yield sign theory and related evidence.

Because we conclude submission of the single broad-form liability question encompassing both the humped crossing and the missing yield sign theory was harmful error, we also sustain KCSR's third issue and remand the case for further proceedings consistent with this opinion.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

Carlyle, J., dissenting

190856F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE KANSAS CITY SOUTHERN
RAILWAY COMPANY, Appellant

No. 05-19-00856-CV        V.

ANGELA HORTON AND KEVIN
HOUSER, Appellees

On Appeal from the 68th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-06507.
Opinion delivered by Chief Justice
Burns. Justices Myers and Carlyle
participating.

Based on the Court's opinion of this date, the trial court's judgment is **REVERSED** and remanded for further proceedings consistent with the opinion.

It is **ORDERED** that appellant THE KANSAS CITY SOUTHERN RAILWAY COMPANY recover its costs of this appeal from appellees ANGELA HORTON AND KEVIN HOUSER.

Judgment entered March 11, 2021.